Terry DONOVAN, Special Administrator in the Matter of the Estate of Dana E. Reinartz, and Parent of David E. Reinartz, a Minor, Plaintiff–Appellant,

v.

CITY OF MILWAUKEE, a Municipal Corporation; Frederick Birts, John C. Bogues, Charles Homa, et al., Defendants–Appellees.

No. 92–4112.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 3, 1993.

Decided Feb. 18, 1994.

Jeff S. Olson (argued), Julian, Olson & Lasker, Kathleen A. Wagner, Wagner Law Offices, Madison, WI, for plaintiff-appellant.

Grant F. Langley, Susan E. Lappen (argued), Office of the City Atty., Milwaukee, WI, for defendants-appellees.

Before WOOD, Jr., FLAUM, and EASTERBROOK, Circuit Judges.

FLAUM, Circuit Judge.

Plaintiff below, Terry Donovan ("Donovan"), commenced this civil rights action pursuant to 42 U.S.C. § 1983, alleging that the City of Milwaukee (the "City") and several Milwaukee police officers violated Dana Reinartz's ("Reinartz") constitutional rights by engaging Reinartz in a high speed chase that ended in a collision killing Reinartz. The district court granted summary judgment for the individual officers on the basis of qualified immunity and for the City because Donovan had failed to state a claim for relief under *Monell v. Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and its progeny. On appeal, Donovan asks this court to reverse the district court's decision with respect to her claims against a single individual defendant, Officer William Zirbes ("Zirbes"), and against the City. We decline to do so, and instead affirm the district court in all respects.

## I.

The events giving rise to this case transpired within a very brief period of time early on the morning of June 19, 1988. At approximately 4:00 a.m., Milwaukee Police Officers Charles Homa ("Homa") and Jeanne Wiedmeyer ("Wiedmeyer") were standing outside their respective vehicles completing a prior dispatch when Homa heard a loud explosion and saw a flash of light. Wiedmeyer also heard the explosion and immediately entered her vehicle to investigate. Homa observed Reinartz and his passenger, Willie Bright ("Bright"), on a motorcycle in the vicinity and decided to ask them if they had information about the explosion. Homa's efforts to signal the driver to pull over proved unsuccessful, causing both Homa and Wiedmeyer to engage in high speed pursuit of the motorcycle. During the chase, officer Zirbes, along with Officers Frederick Birts ("Birts"), John Bogues ("Bogues"), set up visual deterrents or road blocks to stop the motorcycle.[1] The chase ended when the motorcycle became airborne after colliding with Zirbes' squad car. Both Reinartz and Bright died as a result of injuries sustained in the crash.

In the district court, Donovan, the special administrator of Reinartz's estate and the sole surviving parent of Reinartz's only heir, David E. Reinartz, brought a civil rights action under 42 U.S.C. § 1983. Donovan's complaint charged that the City and various police officers violated Reinartz's Fourth, Fifth, and Fourteenth Amendment rights. Specifically, Donovan alleged that several officers used excessive force by engaging Reinartz in high speed pursuit and by using visual deterrents (roadblocks) and that Zirbes unreasonably seized Reinartz. Furthermore, Donovan claimed that the City failed to adequately train, supervise, and discipline the officers who participated in the chase. Finally, Donovan also plead pendant state claims based on negligence and respondeat superior. Both sides filed motions for summary judgment, and, on November 20, 1992, the court denied Donovan's motion and granted the various defendants' motions for summary judgment in their entirety. For purposes of its summary judgment ruling, the district court accepted Donovan's version of certain critical and disputed facts, including Donovan's allegation that the collision was precipitated by Zirbes' intentional backing of his squad car into the path of the motorcycle.[2]

1. The officers positioned their squad cars to partially block the street on which the motorcycle was travelling.

2. Zirbes contends that his squad car was in a stationary position when the motorcycle hit it.

Factual disputes do not preclude summary judgment based on qualified immunity. In such circumstances, "the court considers in the light most favorable to the plaintiff all facts fairly inferable from the record—regardless of factual

Donovan raises just two issues on appeal. First, she contends that the district court erred in granting qualified immunity to Officer Zirbes because a reasonable officer would not have believed that he could use his squad car to actively inflict deadly force at the time of the incident and under the circumstances presented therein. Second, she argues that a material issue of fact exists as to whether the police department's policy on high speed chases, road blocks, and the use of squad cars to inflict deadly force constituted a constitutional violation and led to Reinartz's death. We review the grant of summary judgment *de novo*, drawing all reasonable inferences from the record in the light most favorable to the non-moving party. *Cornfield by Lewis v. School Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir.1993). The non-moving party cannot rest on the pleadings alone, but must identify specific facts to establish that there is a genuine triable issue. Unless we find evidence sufficient to sustain a jury verdict in favor of the non-moving party, we will affirm the grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

## II.

Under the doctrine of qualified immunity, "governmental officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Upton v. Thompson*, 930 F.2d 1209, 1211–1212 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992). Qualified immunity is a judicially created doctrine that stems from the conclusion that few individuals will enter public service if such service entails the risk of personal liability for one's official decisions.

disputes—and decides whether, under those facts, defendant's conduct violated law clearly established at the time." *See Bennett v. Parker*, 898 F.2d 1530, 1536 n. 2 (11th Cir.1990) (Tjoflat, C.J., concurring), *cert. denied*, 498 U.S. 1103, 111 S.Ct. 1003, 112 L.Ed.2d 1085 (1991). Thus, it is

*Cleveland–Perdue v. Brutsche*, 881 F.2d 427, 430 (7th Cir.1989), *cert. denied*, 498 U.S. 949, 111 S.Ct. 368, 112 L.Ed.2d 331 (1990); *see also Malley v. Briggs*, 475 U.S. 335, 339, 106 S.Ct. 1092, 1095, 89 L.Ed.2d 271 (1985).

Though qualified immunity is categorized as a defense, it functions as "an *immunity from suit* rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985) (emphasis in original). Immunity, whether absolute or qualified, "spare[s] a defendant not only unwarranted liability, but unwarranted demands upon those defending a long drawn out lawsuit." *Siegert v. Gilley*, 500 U.S. 226, 231–32, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). In clarifying the analytical structure under which a claim of qualified immunity should be addressed, the *Siegert* Court noted that

> A necessary concomitant to the determination of whether the constitutional right asserted by the plaintiff is "clearly established" at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all.

*Id.* Thus, once a defendant has pleaded a defense of qualified immunity, courts may logically approach a summary judgment motion using a two-step analysis such as that delineated by this court in *Wade v. Hegner*, 804 F.2d 67, 70 (7th Cir.1986): (1) Does the alleged conduct set out a constitutional violation? and (2) Were the constitutional standards clearly established at the time in question? *See Siegert*, 500 U.S. at 231–32, 111 S.Ct. at 1793; *Elliott v. Thomas*, 937 F.2d 338, 341–342 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 973, 117 L.Ed.2d 138 (1992); *Auriemma v. Rice*, 910 F.2d 1449, 1452 (7th Cir.1990) (*en banc*) ("Summary judgment is the proper manner to resolve a qualified immunity issue as soon as possible because it protects 'government officials from the costs of trial and burdens of discovery,

perfectly appropriate for Zirbes to admit to an intentional striking of Reinartz's motorcycle for qualified immunity purposes (to forego a trial), but to deny an intentional striking at trial (to avoid liability).

whenever possible....'"), *cert. denied,* —— U.S. ——, 111 S.Ct. 2796, 115 L.Ed.2d 970 (1991). This approach "permits courts expeditiously to weed out suits which fail the test without requiring the defendant who rightly claims qualified immunity to engage in expensive and time consuming preparation to defend the suit on the merits" because a negative answer to the first question ends the inquiry there. *Siegert,* 500 U.S. at 231–32, 111 S.Ct. at 1793.

### A.

■ We first consider Donovan's claim that Officer Zirbes' conduct violated the Fourth Amendment. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

Following from this language, to determine whether Donovan states a Fourth Amendment cause of action we must determine (1) if Zirbes' conduct constituted a "seizure" and (2) whether the seizure, if one occurred, was "unreasonable".

### 1.

In *Brower v. County of Inyo,* 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989), the Supreme Court considered the parameters of a seizure in the context of a high speed chase that ended when the fleeing suspect fatally crashed into what was alleged to be a "deadman roadblock"[3] set by county police officers. The petitioner's complaint alleged that the respondent police officers placed an 18-wheel truck completely across the highway in the path of the fleeing vehicle, behind a curve, and with a police cruiser's headlights aimed in such a fashion as to blind the driver as he approached. The Court concluded that

a roadblock of the kind alleged constitutes a seizure because it "is not just a significant show of authority designed to induce a voluntary stop, but is designed to produce a stop by physical impact if voluntary compliance does not occur." *Brower,* 489 U.S. at 598, 109 S.Ct. at 1382. More generally, the *Brower* Court opined that

> [A] Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied.*

*Id.* at 596–597, 109 S.Ct. at 1381 (emphasis in original). The Court also distinguished between two hypothetical situations, one of which is closely analogous to the facts of the present case. In the first case, no seizure occurs if a fleeing suspect unexpectedly loses control of his vehicle and crashes; a mere show of authority (flashing lights and continued pursuit) without an intentional acquisition of physical control is insufficient to give rise to a seizure. *Id.* at 595–596, 109 S.Ct. at 1380–1381; *see also Campbell v. White,* 916 F.2d 421, 423 (7th Cir.1990) (holding that an officer's accidental running over of a motorcyclist did not constitute a "seizure" for purposes of determining whether the officer violated the motorcyclist's civil rights), *cert. denied,* 499 U.S. 922, 111 S.Ct. 1314, 113 L.Ed.2d 248 (1991). By contrast, if a police cruiser "had pulled alongside the fleeing car and sideswiped it, producing the crash, then the termination of the suspect's freedom of movement would have been a seizure." *Brower,* 489 U.S. at 597, 109 S.Ct. at 1381.

The similarities between the facts presented here and the Court's hypothetical case compel us to conclude that Zirbes' alleged conduct was a seizure. According to Dono-

---

**3.** A "deadman" roadblock is an obstacle (usually a police car or truck) placed across the road in a manner that is not visible to an oncoming driver who is being pursued by police. Such a roadblock is almost certain to result in a direct and violent (and often fatal) collision between the driver and the obstacle. *See Adams v. St. Lucie County Sheriff's Dept.,* 962 F.2d 1563, 1574 n. 1 (11th Cir.1992) (Edmondson, J., dissenting), *rev'd,* 998 F.2d 923 (11th Cir.1993) (*en banc*).

van's complaint, supported by the affidavit of an eyewitness, Izie Lee Johnson, Zirbes intentionally backed his squad car into the path of the fleeing motorcycle, thereby terminating Reinartz's freedom of movement, and, indeed, sending both driver and passenger airborne.

### 2.

Of course, as the *Brower* Court observed, "'Seizure' alone is not enough for § 1983 liability; the seizure must be 'unreasonable.'" *Id.* at 599, 109 S.Ct. at 1382. In *Tennessee v. Garner,* 471 U.S. 1, 7–8, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985), the Court noted "the many cases in which this Court, by balancing the extent of the intrusion against the need for it, has examined the reasonableness of the manner in which a search or seizure is conducted." *See also Brower,* 489 U.S. at 599, 109 S.Ct. at 1382 (remanding the case to the Ninth Circuit for determination of whether the specific circumstances of the alleged deadman roadblock amounted to an unreasonable seizure). In determining whether Zirbes acted reasonably, we also are reminded that "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," and "its proper application requires careful attention to the facts and circumstances of each particular case." *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). Finally, in judging the "reasonableness" of a particular use of force, we must bear in mind "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–397, 109 S.Ct. at 1871–72.

■ We first consider the appropriateness of analyzing Zirbes' alleged conduct under the specific constitutional guidelines for the use of deadly force to prevent the escape of an unarmed suspect elucidated by the Supreme Court in *Garner.* In that case, the Court stated both a general rule—that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead"—and an exception—"[w]here the offi-cer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Garner,* 471 U.S. at 11, 105 S.Ct. at 1701.

In *Adams v. St. Lucie County Sheriff's Dept.,* 998 F.2d 923 (11th Cir.1993) (*en banc*) (adopting the dissenting opinion of Judge Edmondson reported at 962 F.2d at 1573–1579), the Eleventh Circuit recently distinguished a seizure similar to that effected by Zirbes from that present in *Garner.* In *Adams,* a deputy sheriff intentionally rammed the automobile of a fleeing misdemeanant, causing a crash in which the misdemeanant's passenger was killed. Judge Edmondson's opinion, adopted by the *en banc* court, distinguished these facts from *Garner:*

> A gun is an instrument designed for the destruction of life or the infliction of injury, and death or injury *will result* if a person is struck by a bullet. While an automobile is capable of lethality, it is not designed to kill or injure; and even when automobiles strike each other, death and injury *may well not result....*

*Adams,* 962 F.2d at 1577. These observations are true as far as they go, but the facts of this case represent a middle ground between *Adams* and *Garner* on a continuum measuring the likelihood of death or great bodily harm resulting from a seizure. In *Adams,* the complaint alleged that police car struck the fleeing vehicle several times before the vehicle crashed, and, despite a collision at high speed, the driver in *Adams* "walked away with minor injuries." *Id.* at 1565. At the opposite extreme, a fleeing suspect seized with a bullet (or a deadman roadblock) seems highly unlikely to escape without serious (and often fatal) injuries. While the facts of this case superficially may, on the surface, seem close to *Adams*—both cases involve a seizure by intentionally striking a speeding vehicle with a squad car—the greater likelihood of death or great bodily harm resulting from a collision with a *motorcycle,* as opposed to a car, actually makes this case more akin to *Garner* or *Brower.* It is therefore appropriate to evaluate Zirbes'

alleged conduct as an application of deadly force.

Next, we consider whether Zirbes' alleged conduct may be justified under the *Garner* exception that allows the use of deadly force if the fleeing driver "poses a threat of serious physical harm, either to the officer or to others." 471 U.S. at 11, 105 S.Ct. at 1701. Donovan argues that the *Garner* exception should not apply for two somewhat related reasons. First, she asserts that a *per se* rule rendering reasonable the use of deadly force to seize a fleeing driver would contradict the result in *Brower*. She notes that plaintiff's decedent in *Brower* "had been driving at high speeds for approximately twenty miles in an effort to elude pursuing police." *Brower*, 489 U.S. at 594, 109 S.Ct. at 1380. If the very act of the driver's flight alone were sufficient to trigger the *Garner* exception, then the Court need not have remanded the case for a determination of the reasonableness of the seizure. Second, Donovan argues that the circumstances that might make reasonable the use of deadly force to seize a fleeing driver were not present on the night of June 19, 1988. She submits that the pursuing police officers were the sole cause of Reinartz's reckless operation of his motorcycle and that his reckless driving would have ended if the pursuit ended. Furthermore, citing Zirbes' deposition, Donovan contends that the high speed chase did not present a threat of imminent harm to other drivers or pedestrians that might justify the use of deadly force under *Garner*.

The Supreme Court has not clearly delineated the scope of the *Garner* exception. As the Ninth Circuit observed in its consideration of *Brower* on remand, "It is not clear from *Garner* that the 'substantial threat' requirement is satisfied by danger that is present only as a result of police pursuit." *Brower v. County of Inyo*, 884 F.2d 1316, 1317 n. 1 (9th Cir.1989). For example, the Sixth Circuit opinion reviewed by the Court in *Garner* held that deadly force is only appropriate "when the suspect poses a threat to the safety of the officers or a danger to the community *if left at large.*" *Id.* at 1317–1318 (citing *Garner v. Memphis Police Dept.*, 710 F.2d 240, 246 (6th Cir.1983) (emphasis added)). In a later case, *Smith v. Freland*, 954 F.2d 343 (6th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 1954, 118 L.Ed.2d 557 (1992), the Sixth Circuit relied on the *Garner* exception in affirming a district court decision holding that a police officer who fatally shot a misdemeanant driver trying to escape after a high speed chase had not affected an unreasonable seizure. The decedent driver, Smith, initiated a wild chase after speeding and running a stop sign. At one point, Smith appeared to be stalled in a field, but as the officer's car approached, Smith managed to maneuver out, swerving twice toward the police cruiser before speeding away. Later, after the police officer had cornered Smith on a dead-end residential street, Smith attempted to flee by crashing into the officer's car and smashing into a fence and gate in front of the local swimming pool. As Smith zoomed past the squad car, the police officer fired a single shot that struck and killed the driver. *Id.* 954 F.2d at 344. The district court held that the *Garner* exception applied despite its finding that "Officer Schulcz was not in any immediate personal danger at the time he discharged his weapon." *Id.* at 346. The Sixth Circuit affirmed, reasoning that, even unarmed, Smith was dangerous because of the way he was operating the car. Furthermore, having "proven that he would do almost anything to avoid capture," the court hypothesized that Smith may have gone so far as to enter one of the neighboring houses hoping to take hostages. *Id.* at 347.[4]

Because we decide this case on qualified immunity grounds, *see infra* at 16, we need not decide today whether Zirbes' alleged conduct actually violated the Fourth Amendment. At the same time, however, we cannot say with any degree of assurance that "even today[,] if defendants did everything

---

4. We note also that in *Adams* the Eleventh Circuit commented on the *Garner* exception. The court asserted that "[a] driver—even a misdemeanant—eluding arrest in a car driven at high speeds creates a dangerous and potentially deadly force." 962 F.2d at 1578. Nevertheless, the Court stopped short of holding that ramming a fleeing suspect constitutes a reasonable seizure in all circumstances. *Id.* ("Under the circumstances alleged here, the police *very possibly* behaved lawfully.") (emphasis added).

the plaintiffs alleged, still they did not violate the Constitution." *Elliott*, 937 F.2d at 341. After reviewing the cases, we are very skeptical that the intentional striking of the fleeing suspect's vehicle could constitute a reasonable seizure in all circumstances. As noted above, *supra* at 949, "reasonableness" in each case is highly fact-specific and cannot be reduced to a precise definition or test. *See Graham*, 490 U.S. at 396, 109 S.Ct. at 1871. Here, for example, we distinguish between a motorcycle and an automobile in terms of the likelihood that a particular seizure amounts to the use of deadly force. Again, we are aware that exigent circumstances require snap judgments from police officers as they decide whether and how to seize a suspect. *See Freland*, 954 F.2d at 347 ("We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day. What constitutes 'reasonable' action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure."). Yet, while giving due deference to difficult judgment calls made on the street, we also must insure the rights of citizens, even fleeing felons, to be free from unreasonable seizures. Police officers may, and ought to, pursue fleeing suspects, and where those suspects present "a threat of serious physical harm, either to the officer[s] or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Garner*, 471 U.S. at 11, 105 S.Ct. at 1701. But not every fleeing suspect poses a grave danger. In this case, for example, there is no evidence that Reinartz imperiled anyone (except himself and his willing passenger); he was driving his motorcycle through empty city streets in the wee hours of the morning. Nothing in the record parallels the circumstances of *Freland*, where the fleeing driver twice swerved his vehicle in the direction of a police cruiser and maneuvered his car through lawns, fences, and gates in a residential neighborhood. Therefore, accepting Donovan's version of the facts, we believe that a trier of fact could find that Zirbes' intentional striking of Reinartz's motorcycle violated the Fourth Amendment.

### B.

However, to conclude today that Zirbes' striking of Reinartz's motorcycle under these circumstances was unreasonable is not enough to deny Zirbes the shield of qualified immunity. Before doing this, we must determine whether Zirbes' conduct was clearly established as unreasonable as of June 19, 1988.

Since *Harlow*, courts have employed an objective test for determining whether public official defendants are entitled to qualified immunity. *See Triad Associates, Inc. v. Robinson*, 10 F.3d 492, 496 (7th Cir.1993); *Brutsche*, 881 F.2d at 430. The objective standard protects the public interest in deterrence of and compensation for an official's unlawful conduct while safeguarding the official's ability to make difficult decisions "with independence and without fear of consequences." *Harlow*, 457 U.S. at 819, 102 S.Ct. at 2738 (citing *Pierson v. Ray*, 386 U.S. 547, 554, 87 S.Ct. 1213, 1217, 18 L.Ed.2d 288 (1967)). As this court has stated rather concisely, the defense of qualified immunity "gives public officials the benefit of legal doubts." *Elliott*, 937 F.2d at 341; *see also Crosetto v. State Bar of Wisconsin*, 12 F.3d 1396, 1403 (7th Cir.1993). In *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1986), the Court further elucidated the circumstances under which an official performing discretionary duties may be stripped of immunity. In *Anderson*, the Court emphasized that the right allegedly violated must have been "clearly established" in a "particularized" sense and "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right" at the time of the incident. *Id.* at 639–40, 107 S.Ct. at 3038–39, *see also Auriemma*, 910 F.2d at 1455. Thus, drawing on *Harlow* and *Anderson*, this court has noted that "the touchstone of a qualified immunity inquiry is the clarity of the state of the law in relation to the defendant's conduct at the time the conduct occurred." *Triad*, 10 F.3d at 496.

The plaintiff bears the burden of establishing the existence of a clearly established constitutional right. *Rakovich v. Wade*, 850

F.2d 1180, 1209 (7th Cir.) (*en banc*), *cert. denied,* 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988). In ascertaining whether a particular right has been "clearly established" within the meaning of *Harlow,* this court has not required binding precedent from the Supreme Court or the Seventh Circuit. *Cleveland–Perdue,* 881 F.2d at 431. In the absence of controlling authority on point, "we seek to determine whether there was such a clear trend in the caselaw that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *Id.* In identifying the relevant trends, plaintiffs need not direct the court to cases "on all fours" with the case at bar; however, "case law in a closely analogous area is crucial to permit us to conclude that reasonably diligent government officials would have known of the case law, related it to the situation at hand, and molded their conduct accordingly." *Lojuk v. Johnson,* 770 F.2d 619, 628 (7th Cir.1985), *cert. denied,* 474 U.S. 1067, 106 S.Ct. 822, 88 L.Ed.2d 795 (1986). Plaintiffs thus must shoulder a rather heavy burden, and appropriately so because qualified immunity is "designed to shield from civil immunity 'all but the plainly incompetent or those who knowingly violate the law.' " *Hughes v. Meyer,* 880 F.2d 967, 971 (7th Cir.1989), *cert. denied sub nom., Hughes v. Buss,* 495 U.S. 931, 110 S.Ct. 2172, 109 L.Ed.2d 501 (1990) (quoting *Malley,* 475 U.S. at 341, 106 S.Ct. at 1096).

Donovan insists that *Tennessee v. Garner* clearly established a right to be free from police seizures inflicted through the use of deadly force, subject, of course, to the exception for suspects who pose a threat of serious physical harm. Donovan submits that neither *Garner* nor any other authority distinguishes between deadly force inflicted with a gun and deadly force inflicted with an automobile. Thus, she argues that *Garner* necessitates the conclusion that recognition of its application to a vehicular situation was "merely a question of time."

After reviewing the relevant case law, we are compelled to disagree with Donovan. The most analogous case, *Adams v. St. Lucie Sheriff's Dept.,* illustrates both the difficulty and closeness of the question presented here. In *Adams,* a divided panel of the Eleventh Circuit relied on *Garner* and affirmed the district court's denial of summary judgment based on qualified immunity to a police officer who intentionally rammed the vehicle of a fleeing suspect, thereby causing an accident that killed a passenger in the suspect's car. 962 F.2d 1563.[5] The court then vacated the original panel opinion and granted rehearing *en banc.* 982 F.2d 472 (11th Cir.1993). The *en banc* court reversed the district court on the ground that the law was not clearly established as of 1985 that the officer's actions constituted an unreasonable seizure in violation of the Fourth Amendment. We find the Eleventh Circuit's reasoning and conclusion persuasive, and, applying it to the case at bar, hold that defendant Zirbes was entitled to qualified immunity.

We agree with the *Adams* court that *Garner* is not the appropriate starting point for our analysis because *Garner*'s facts are too different. We look instead to deadman roadblock cases which are more analogous to this case and to *Adams* because they more closely define the contours of the right at stake here—to be free from unreasonable police seizures of fleeing vehicles—and therefore best illustrate "whether the law was clear in relation to the *specific* facts confronting the public official when he or she acted." *Cornfield by Lewis,* 991 F.2d at 1324 (quoting *Green v. Carlson,* 826 F.2d 647, 649 (7th Cir.1987)). Put differently, *Garner* is not the most apt analogy to this case because the facts of *Garner* are not sufficiently particularized to put potential defendants on notice that striking a fleeing vehicle with their police cruisers constitutes an unreasonable seizure. This is so even if, as Donovan asserts, the court's language in *Garner* uses the term "deadly force" rather than terms related to firearms. As the *Adams* court correctly ob-

---

**5.** To be sure, this case is not *exactly* like *Adams.* As we noted above, *supra* at 10, using a police cruiser to seize a fleeing motorcycle is more likely to cause death or great bodily harm than inflicting the same seizure on a fleeing car. This distinction, however, impacts on the reasonableness of the seizure and not on the state of the clearly established law at the time of the incident.

served, "generalities are just not helpful" in qualified immunity decisions because "[t]he bright line of 'clearly established law'" is "staked out by a process of inclusion and exclusion in individual, concrete cases." 962 F.2d at 1576 (citations omitted).

The *Adams* court convincingly demonstrated that as recently as March, 1989, a split existed among the federal circuit courts about whether the intentional use of a deadman roadblock even constituted a Fourth Amendment seizure. *Compare Brower v. County of Inyo*, 817 F.2d 540 (9th Cir.1987) (successful deadman roadblock resulting in fatalities constitutes no seizure), *rev'd*, 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989) *with Jamieson v. Shaw*, 772 F.2d 1205 (5th Cir.1985) (successful deadman roadblock constitutes seizure).[6] Because only two circuits had considered cases on point, reaching opposite results, we conclude that "the relevant case law was still developing [and] the key issue in this case had not been clearly settled" as of June 19, 1988. *See Barts v. Joyner*, 865 F.2d 1187, 1194 (11th Cir.), *cert. denied*, 493 U.S. 831, 110 S.Ct. 101, 107 L.Ed.2d 65 (1989). Donovan therefore has failed to carry her burden of showing the existence of clearly established case law making Zirbes' alleged conduct unlawful. Zirbes was entitled to qualified immunity, and the district court properly granted summary judgment to him.

### III.

The second issue raised in Donovan's appeal is whether the district court erred in granting summary judgment for the City of Milwaukee on the ground that Donovan had failed to establish a causal connection between the City's official written policy and any violation of Reinartz's constitutional rights. The specific policy to which Donovan calls our attention is Milwaukee Police Department Order No. 9491, "Amendment of Standard Operating Procedures Relating to High Speed Pursuits," issued January 30, 1987, which states in relevant part:

b) Police officers engaged in the motor vehicle pursuit of a driver who is an IMMEDIATE threat to the safety of the public may take reasonable and prudent measures to apprehend the driver without endangering the welfare of others. However, the deliberate striking of a pursued vehicle or the use of a department or other vehicle(s) as a stationary barricade is only permitted to be used as a last resort when:

(1) the occupant(s) of the vehicle being pursued is wanted for a serious felony, or

(2) the manner in which the pursued vehicle is being operated creates a substantial risk of serious injury or death.

c) The department vehicle operator or supervisor shall terminate a motor vehicle pursuit when in his/her judgment further pursuit is not warranted. Some examples of items to be considered are the volume of pedestrian and/or vehicular traffic, road and weather hazards or the distance between vehicles indicates that further pursuit will create more danger to the public and/or department members than does the conduct of the pursued driver.

Donovan contends that this policy caused the unconstitutional actions which led to Reinartz's death in at least two ways. First, she argues that the policy authorizes the deliberate striking of a pursued vehicle and the use of a stationary roadblock when the pursued vehicle is being operated in a dangerous fashion, even if the fleeing subject's dangerous driving results solely from the fact of the police pursuit. Second, she submits that the policy exhibits "deliberate indifference" to the well-being of Reinartz because it does not list the safety of the pursued driver as a relevant factor when deciding whether to terminate a high speed chase.

### A.

Under *Monell v. Dept. of Social Services of New York*, municipal liability attaches only "when execution of a government's policy or

---

**6.** The Supreme Court's *Brower* decision, of course, resolved the circuit split along the lines of *Jamieson*, but the Court did not conclude that seizures accomplished through deadman roadblocks are unreasonable in all cases.

custom, whether made by lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury [for which] the government as an entity is responsible under § 1983." 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). As the City does not appear to contest the proposition that Police Department Order No. 9491 "may fairly be said to represent official policy," we may move directly to the question of whether Donovan can establish a direct causal link between the municipal policy and the alleged constitutional deprivation. *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 1202, 103 L.Ed.2d 412 (1989); *Oklahoma City v. Tuttle,* 471 U.S. 808, 824, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985) (plurality opinion); *Sims v. Mulcahy,* 902 F.2d 524, 542 (7th Cir.), *cert. denied,* 498 U.S. 897, 111 S.Ct. 249, 112 L.Ed.2d 207 (1990).

Donovan could demonstrate the required causal link if she could demonstrate that either the roadblock or the seizure were the result of "a deliberate choice to follow a course of action ... made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Sims,* 902 F.2d at 542 (quoting *Zook v. Brown,* 865 F.2d 887, 895 (7th Cir.1989)). However, as was the case in *Sims,* the only individuals even arguably responsible for the alleged constitutional violations were subordinate police officers who clearly were not vested with any final policy making authority. Thus, Donovan may not establish municipal liability on this basis.

The City also may be held liable for damages under *Monell* if Donovan could demonstrate that one or more of the officers took unconstitutional action pursuant to official policy. Examining the policy in question, we note first that section (b) clearly authorizes, as a last resort, the deliberate striking of pursued vehicles and the use of stationary barricades, both of which constitute seizures that in some circumstances may be unreasonable. Subsection (2), however, limits the authorization of deadly force in language that closely parallels the Supreme Court's language in *Garner.* Drawing on this language, we are convinced that the City's formal official policy on the use of force was "to require officers to conform to the limitations [of] the Constitution." *Sims,* 902 F.2d at 542. As we noted above, *supra* at 949, the Supreme Court has not fully explored the parameters of the *Garner* exception, and, until today, neither had this court. Thus, even if Zirbes' actions violated Reinartz's constitutional rights,[7] we cannot say that Zirbes acted pursuant to an unconstitutional policy.[8]

This conclusion does not quite end our inquiry because the Supreme Court has rejected a *per se* rule that municipal liability attaches under § 1983 only where "the policy in question [is] itself unconstitutional," *Harris,* 489 U.S. at 386–387, 109 S.Ct. at 1203. Nevertheless, it does raise the threshold showing required to impose municipal liability. As the Court explained in *Tuttle,*

> Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal poli-

7. Even if intentionally striking a fleeing motorcycle under the circumstances of this case constituted an unreasonable seizure, we doubt that a roadblock of the type presented here could, standing alone, violate the Constitution. Donovan argues that the affidavit of Matt del Fatti, an accident reconstruction expert, at least raises a material issue of fact as to whether Reinartz and Bright could have survived the pursuit and roadblock even if Zirbes' had not driven into their motorcycle. We cannot agree. This was not a deadman roadblock. Donovan does not dispute that the roadblock left unobstructed the entire eastbound lane in which Reinartz properly should have been driving. Del Fatti's affidavit, in fact, recognizes that the roadblock permitted a

safe escape route to Donovan and only after Reinartz "decided to travel north of Squad 78" was there "no action he could have taken which would not have resulted, to a reasonable degree of professional certainty, in a fatal crash." On these facts, it is highly unlikely that a court could conclude that the roadblock constituted "a governmental termination of freedom of movement *through means intentionally applied.*" *Brower,* 489 U.S. at 597, 109 S.Ct. at 1381.

8. We need not examine section (b)(1) because all parties agree that Reinartz was not wanted for a serious felony, and, therefore, the officers could not have been acting pursuant to section (b)(1).

cy, which policy can be attributable to a municipal policymaker.... [W]here the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the "policy" and the constitutional deprivation.

471 U.S. at 823–824, 105 S.Ct. at 2436 (footnotes omitted). This, too, is a heavy burden, and in light of the fact that Donovan has submitted no evidence of additional incidents of allegedly unconstitutional actions stemming from the City's "ramming and roadblock" policy, we conclude that she has not sufficiently shown a direct causal link between the policy and the alleged constitutional deprivation.

### B.

■ Finally, we consider Donovan's claim that the City's policy contributed causally to Reinartz's death because it does not list the safety of the pursued driver as a relevant factor when deciding whether to terminate a high speed chase. This omission, according to Donovan, establishes the City's "failure to train its employees in a relevant respect" and evidences a "deliberate indifference" to Reinartz's rights. *See City of Canton*, 489 U.S. at 389, 109 S.Ct. at 1205.[9] As we have noted, deliberate indifference is "an elusive standard," *Cornfield by Lewis*, 991 F.2d at 1327, but we know from *City of Canton* that it can be satisfied where "in light of the duties assigned to specific officers or employees the need for more or different training is [ ] obvious, and the inadequacy [ ] likely to result in violation of constitutional rights." 489 U.S. at 390, 109 S.Ct. at 1205. Thus, when coupled with the causation requirement, municipal liability does not obtain unless policymakers "have actual or constructive notice that a particular omission [ ] is likely to result in constitutional violations." *Cornfield by Lewis*, 991 F.2d at 1327; *see also Sims,*

902 F.2d at 543 ("A plaintiff that faults a municipality's inaction must show that there is an 'extremely high degree' of municipal culpability.").

In *City of Canton,* the Court illustrated its "deliberate indifference" standard with two examples that are instructive here. The factual predicate of the first case bore some resemblance to our case: city policymakers know that their police officers will be required to arrest fleeing felons and the city has armed its officers to this end. Following from this, the Court posited that the need to train officers in the constitutional limitations on the use of deadly force is "so obvious" that failure to do so would amount to "deliberate indifference." 489 U.S. at 390 n. 10, 109 S.Ct. at 1205 n. 10 (citing *Garner,* 471 U.S. at 1, 105 S.Ct. at 1694). In the second case, even where the need to train is not obvious from the outset, a municipality can be "deliberately indifferent" if its officers, in exercising their discretion, so often violate constitutional rights that the need for further training should have been "plainly obvious" to policymakers. *Id.*

Donovan can draw little support from the Court's first example. She contests the adequacy of the City's policy, not its absence altogether. Indeed, the record shows that City has promulgated fairly extensive policy on the use of deadly force as well as on proper procedures for high speed chases, stationary barricades, and deliberate striking of fleeing vehicles. The mere fact that the City has not included an explicit reference to the safety and well-being of the pursued driver among its "examples of items to be considered" when deciding whether to terminate a chase cannot rise to the level of "deliberate indifference" to Reinartz's constitutional rights. The City has a constitutional duty to avoid unreasonably seizing Reinartz, and the policy more than adequately informs Milwaukee police officers of their role in discharging that duty. The Court's second example, likewise, does not advance Donovan's

---

9. In light of *Collins v. City of Harker Heights,* — U.S. —, —, 112 S.Ct. 1061, 1067–1068, 117 L.Ed.2d 261 (1992), it is clear that the term "deliberate indifference" was used in *City of Canton* for the "purpose of identifying the threshold for holding a city responsible for the constitu-

tional torts committed by its inadequately trained agents." Thus, *City of Canton* addresses the mental state component of a constitutional violation, but does not imply that all acts with such a mental state are unconstitutional.

argument. The record is devoid of evidence that the failure to supplement its high speed chase policy with an exhortation to consider the safety of fleeing drivers and their passengers has led to frequent constitutional violations. Even if this case were such an instance, we could not find the City deliberately indifferent—there must be a "pattern of violations" sufficient to put the City on notice of potential harm to the fleeing drivers.[10] Thus, we conclude that the district court properly granted summary judgment for the City of Milwaukee on Donovan's *Monell* claim.

### IV.

In authorizing the use of deadly force in certain circumstances, society places awesome responsibility in the hands of its law enforcement officials. Our duty as a court is to ensure that this power is exercised within the bounds of the law. Under the Constitution, all citizens, even fleeing felons, have a right to be free from unreasonable government seizures. Nevertheless, because the doctrine of qualified immunity "gives public officials the benefit of legal doubts," *Elliott,* 937 F.2d at 341, police officers are liable in damages only where the law they violated was clearly established at the time they acted. Thus, even if Zirbes' alleged conduct violated the Constitution, he is entitled to qualified immunity (and summary judgment) because Donovan has not demonstrated that the relevant law was settled in a particularized sense as of June 19, 1988. The City of Milwaukee also was properly granted summary judgment because Donovan has not stated a claim under *Monell* and its progeny.

For the foregoing reasons, the judgment of the district court is AFFIRMED in all respects.

---

**10.** Even if we were persuaded by Donovan's argument that the City's failure to train rose to the level of "deliberate indifference," we fail to see how this would be of much help to her. Failure to train is evidence of the mental state required to establish a claim for a violation of the Constitution, *see Collins,* — U.S. at ——, 112 S.Ct. at 1068, but it is not an independent claim. A claim such as Donovan's lies in a substantive wrong—for example, infliction of cruel punishment, violation of due process, or unreasonable seizure—rather than in the failure to train. While a due process claim has a mental component, a pure Fourth Amendment claim for unreasonable seizure lacks such an ingredient. *Graham,* 490 U.S. at 397–398, 109 S.Ct. at 1872–73.