Nancy Ann RANDALL, as Mother of Jazmyn Lee Vent, and as Personal Representative of the Estate of Corwin Lee Vent, Plaintiffs,

v.

The CITY OF FAIRBANKS and Perry Williamson, Defendants.

No. F03–0001CVRRB.

United States District Court, D. Alaska.

Jan. 11, 2005.

## ORDER GRANTING MOTION FOR QUALIFIED IMMUNITY FOR OFFICER WILLIAMSON

BEISTLINE, District Judge.

## I. INTRODUCTION

Before the Court is Defendant Perry Williamson ("Williamson") with a motion for qualified immunity because his decision to shoot Corwin Vent was objectively reasonable under the circumstances and did not violate the constitutional rights of Vent.[1] Additionally, Williamson argues that ALASKA STAT. § 9.65.210 bars the Plaintiffs from recovering because Vent's death occurred during the commission of an unclassified felony, Class A felony, and/or Class B felony.[2]

Plaintiff Nancy Ann Randall ("Randall") opposes and argues that Williamson's actions were not objectively reasonable and he violated the constitutional rights of Vent.[3] Randall also argues that her claim is not barred by ALASKA STAT. § 09.65.210 because a State statute barring recovery under Federal law is inconsistent with the policies behind § 1983 actions.[4]

Because the Court concludes that the law was not clearly established when Williamson used deadly force against Vent, it HOLDS that Williamson is entitled to qualified immunity. As a result, the Court does not consider whether applying ALAS-KA STAT. § 09.65.210 in this action would be inconsistent with the policies of § 1983.

## II. FACTS

This case arises out of a series of events that occurred during the afternoon and early evening of October 29, 2000. Shortly after 4:00 p.m., Officer Johnson observed a male in a brown van driving erratically on Airport Way in Fairbanks, Alaska.[5] Johnson observed the van run a red light and reach speeds close to 80 miles per hour.[6] However, Johnson ended the police chase when it appeared that the driver was going to get too reckless.[7] Johnson and other officers next saw the van on Cowles St. where, though the driver slowed for an intersection, he still ran the stop sign.[8] The officers then lost track of the van.[9]

While the officers continued to look for the van, they learned that the van was most likely being driven by Corwin Vent.[10] Officer Terland then observed Vent and a female passenger on College Road.[11] Terland observed Vent run a red light, drive rapidly through an area with pedestrians present, and run a stop sign.[12] Terland observed Vent run another red light before the chase was picked up by Officer Williamson.[13] Williamson was aware of the police chase of Vent and was waiting at College Road for Vent to exit the Johansen

---

1. Clerk's Docket No. 20 at 26. Originally, the City of Fairbanks was also a Defendant but summary judgment was granted in favor of the City. Clerk's Docket No. 29.

2. *Id.* at 31.

3. Clerk's Docket No. 26 at 2.

4. *Id.* at 3.

5. Clerk's Docket No. 20 at Ex. E, 1.

6. *Id.*

7. *Id.*

8. *Id.* at Ex. E, 2.

9. *Id.* at Ex. E, 3–4.

10. *Id.* at Ex. E, 6.

11. *Id.* at Ex. E, 11. The female passenger was Nancy Ann Randall. Clerk's Docket No. 26 at Ex. 1, 3.

12. Clerk's Docket No. 20 at Terland Depo. 9–15.

13. *Id.* at 16; Williamson Depo. 93.

Expressway.[14] On College Road, Vent's van approached Williamson's car, but Williamson braked to let Vent pass him.[15]

The pursuit was briefly called off, but then resumed again when Vent turned into the College Road Fred Meyer parking lot.[16] Williamson observed Vent drive rapidly through the Fred Meyer parking lot with pedestrians present.[17] Williamson observed Vent run the stop sign as he left the parking lot.[18] Vent then made a left-hand turn at a subsequent red light.[19] Williamson continued to observe Vent drive recklessly as he cut through the Steese Mall parking lot, cross the Old Steese Highway, and enter the Allstate Insurance Company parking lot, without ever slowing down.[20] Officer Rigdon then continued to follow Vent as he crossed the Cushman Street Bridge and turned onto First Avenue.[21] Rigdon clocked Vent going 45–56 miles per hour (in a 30 miles per hour zone) and then going 40–50 miles per hour (in a 25 miles per hour zone).[22]

Officer Williamson traveled to the intersection at Cowles and Airport Way to stop traffic since he knew that Vent was heading in that direction.[23] Williamson stopped all eastbound traffic on Airport Way.[24] Williamson exited his vehicle, stepped into the crosswalk, and looked down Airport Way to find Vent's van.[25] Williamson did not realize which van was Vent's until the van started moving between the vehicles in the fast and slow lanes.[26] The van was moving at a "slow walking pace."[27] Williamson stepped forward toward the van.[28] Williamson heard the van scrape at least one of the cars stopped on Airport Way.[29] When the van was approximately one car length away, Williamson drew his service pistol.[30] When Vent saw the pistol, he ducked down in the driver's seat.[31] The van did not accelerate, though it is contested whether the van stopped or continued to move at a slow walking pace.[32] Williamson's left hand and forearm touched the hood of the van, the van touched his shins, and he fired his pistol in a downward angle toward where Vent was ducking.[33] Williamson felt the vehicle lurch as it moved forward and he jumped to his left.[34]

Afterwards, when Vent's van was searched, police found bindles and tooters

14. *Id.* at Williamson Depo. 93. The Court notes that Williamson only knew that this was a van being driven recklessly, and he did not know who was driving the van at this point. Clerk's Docket No. 26 at Ex. 5, 9.

15. Clerk's Docket No. 20 at Williamson Depo. 93.

16. *Id.* at Ex. E, 12; Williamson Depo. 87.

17. *Id.;* Rigdon Depo. 14.

18. *Id.* at Williamson Depo. 51.

19. *Id.*

20. *Id.*

21. *Id.* at Rigdon Depo. 20.

22. *Id.*

23. *Id.* at Williamson Depo. 94.

24. *Id.* at 94–95.

25. *Id.* at 96.

26. *Id.*

27. *Id.* at 102.

28. *Id.* at 97.

29. *Id.* at 98.

30. *Id.* at 98–99.

31. *Id.* at 102.

32. *Id.* at 104; Clerk's Docket No. 26 at Ex. 1, 7.

33. Clerk's Docket No. 20 at Williamson Depo. 105–110.

34. *Id.* at 110–11.

that tested positive for cocaine.[35] The van also contained empty beer bottles and an empty case of beer.[36] A bag with white powder was found, and the substance later tested positive for cocaine.[37] Additionally, Vent's blood alcohol level was .142 grams per decaliter and he tested positive for cocaine.[38]

## III. STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if there is no genuine dispute as to material facts and if the moving party is entitled to judgment as a matter of law. The moving party has the burden of showing that there is no genuine dispute as to material fact.[39] The moving party need not present evidence; it needs only point out the lack of any genuine dispute as to material fact.[40] Once the moving party has met this burden, the nonmoving party must set forth evidence of specific facts showing the existence of a genuine issue for trial.[41] All evidence presented by the non-movant must be believed for purposes of summary judgment, and all justifiable inferences must be drawn in favor of the non-movant.[42] However, the nonmoving party may not rest upon mere allegations or denials, but must show that there is sufficient evidence supporting the claimed factual dispute to require a fact-finder to resolve the parties' differing versions of the truth at trial.

## IV. DISCUSSION

### A. Section 1983 Claim

Randall alleges that the use of deadly force against Corwin Vent violated his rights and she seeks monetary damages from Officer Williamson.[43] Williamson argues that he did not violate Vent's constitutional rights and he is protected by the doctrine of qualified immunity.[44] "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.' "[45]

To evaluate a claim of qualified immunity, a court must first consider the threshold question of whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right.[46] If the officer violated a constitutional right, "the next, sequential step is to ask whether the right was clearly established" at the time of the violation.[47] This requires an assessment of whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."[48] Thus, to survive the Defendant's motion for qualified immunity, Randall must state a violation of a constitutional right, and

---

35. *Id.* at Ex. L, 2.

36. *Id.*

37. *Id.* at Palmer Depo. 8.

38. *Id.* at Fallico Depo. 8–9.

39. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

40. *Id.* at 323–25, 106 S.Ct. 2548.

41. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

42. *Id.* at 255, 106 S.Ct. 2505.

43. Clerk's Docket No. 1. This case was subsequently removed to federal court by the defendants. *Id.*

44. Clerk's Docket No. 20 at 26.

45. *Saucier v. Katz*, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

46. *Id.* at 201, 121 S.Ct. 2151.

47. *Id.*

48. *Id.* at 202, 121 S.Ct. 2151 (citation omitted).

that right must have been clearly established at the time Corwin Vent was shot by Officer Williamson on October 29, 2000.

## B. Constitutional Violation

██The Fourth Amendment protects citizens from "unreasonable seizures" and thus prohibits the use of excessive force by police when apprehending suspected criminals.[49] All claims alleging that a police officer used excessive force to effect a seizure are analyzed under the Fourth Amendment.[50] The test is one of "objective reasonableness under the circumstances."[51] The court must weigh "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."[52] Specifically, the court should consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight."[53] In weighing these factors, the Supreme Court of the United States cautioned that "the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective. We set out a test that cautioned against the '20/20 vision of hindsight' in favor of deference to the judgment of reasonable officers on the scene."[54] The Supreme Court held that "the question is whether the officers' ac-

tions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."[55] The critical question is whether a reasonable officer in these same circumstances would have concluded that a threat existed to justify the use of deadly force.

██ When an officer uses deadly force to effect a seizure, the intrusion on Fourth Amendment rights is unmatched.[56] An officer may only use deadly force when "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."[57] However, the mere fact that a suspect possesses a weapon does not justify deadly force.[58]

██ The first factor under *Graham* concerns the severity of the criminal activity involved in by Corwin Vent leading up to the officer's use of force. The suspected criminal activity of Vent that Williamson was aware of involved failure to stop at the direction of police officers. In 2000, a driver's failure to stop at the direction of a police officer was a Class C felony if the driver also violated a traffic law or committed another crime.[59] While a felony is a serious crime, this felony did not involve harm to another, nor was there a felony independent of the pursuit. As to the third factor under *Graham*, Vent's failure

---

49. *Graham v. Connor*, 490 U.S. 386, 394–95, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

50. *Id.* at 395, 109 S.Ct. 1865.

51. *Id.* at 399, 109 S.Ct. 1865.

52. *Id.* at 396, 109 S.Ct. 1865.

53. *Id.*

54. *Saucier v. Katz*, 533 U.S. 194, 204–05, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (citing *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)).

55. *Graham*, 490 U.S. at 397, 109 S.Ct. 1865.

56. *Tennessee v. Garner*, 471 U.S. 1, 9, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).

57. *Id.* at 3, 105 S.Ct. 1694.

58. *Harris v. Roderick*, 126 F.3d 1189, 1202 (9th Cir.1997).

59. ALASKA STAT. § 28.35.182 (2000).

to stop weighs in favor of Williamson because Vent was "actively resisting arrest or attempting to evade arrest by flight."[60] However, this factor alone cannot justify the use of deadly force.[61]

■ Ultimately, the use of force in this case must be based on the second *Graham* factor, whether Vent posed "an immediate threat to the safety of the officer or others."[62] Because the officer used deadly force, the threat must not only be immediate, but also be one of serious physical harm, based on probable cause.[63] Officer Williamson relies on the threat to him or others from Vent's van striking him or continuing to drive recklessly.[64] Williamson argues that he could have been run over by Vent, and that beyond him, "to the best of his knowledge was an open road for more of Mr. Vent's reckless, dangerous driving."[65]

Here, the potential threat to Williamson and others resulted from Vent being in control of an automobile. It is accepted that an automobile can inflict deadly force and, under certain circumstances, constitute the type of threat that justifies an officer's use of deadly force.[66] However, the Ninth Circuit disapproved of the argument that the need to prevent dangerous high-speed police chases can always justify the use of deadly force.[67]

In evaluating the use of force in this case, the inquiry must focus on the facts known to the officer at the time of the shooting, rather than all objective facts in the record.[68] For this reason, the objective reasonableness of the officer's actions cannot be evaluated based on facts that were not known to him, even if known to others. Therefore, in this inquiry, the Court cannot consider evidence concerning Vent's prior criminal history, the fact that he did not have a driver's license, that he had two outstanding warrants, incidents during the police chase not known to Williamson, or his levels of alcohol and cocaine intoxication at the time of the shooting.[69]

■ If the facts are taken in the light most favorable to Randall, a reasonable officer might not have believed that he had probable cause that Vent posed an immediate threat of death or serious physical injury to himself. The Court agrees with Williamson that he had no duty to retreat, but the fact that there is no such duty does not give an officer probable cause to use deadly force. The van was moving toward Williamson at a slow walking pace, did not accelerate, and, according to Randall, was stopped when Williamson fired.[70] William-

---

60. *Graham,* 490 U.S. at 396, 109 S.Ct. 1865.

61. *Tennessee,* 471 U.S. at 11, 105 S.Ct. 1694.

62. *Graham,* 490 U.S. at 396, 109 S.Ct. 1865.

63. *Garner,* 471 U.S. at 11, 105 S.Ct. 1694.

64. Clerk's Docket No. 20 at 25.

65. *Id.*

66. *Acosta v. City and County of San Francisco,* 83 F.3d 1143, 1147 n. 9 (9th Cir.1996) (finding that relevant considerations into whether the automobile as weapon justified deadly force included "the speed at which the vehicle was traveling and the officer's ability to avoid the oncoming vehicle").

67. *Haugen v. Brosseau,* 339 F.3d 857, 868–73 (9th Cir.2003), *rev'd on other grounds,* —— U.S. ——, 125 S.Ct. 596, —— L.Ed.2d —— (2004). *See also Vaughan v. Cox,* 343 F.3d 1323 (11th Cir.2003); *Donovan v. City of Milwaukee,* 17 F.3d 944, 951 (7th Cir.1994).

68. *Saucier v. Katz,* 533 U.S. 194, 204–05, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (citing *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)).

69. Clerk's Docket No. 26 at Ex. 5, 8–9.

70. Clerk's Docket No. 20 at Williamson Depo. 102.

son apparently had time to get out of the way of the van. While the van came toward Williamson's position, there is no evidence that Vent was purposefully steering the van to hit Williamson. Williamson could not see who the driver was and only assumed that Vent was driving the van.[71] These circumstances alone may not be enough to constitute an immediate threat of serious injury or death to Williamson. Certainly a jury question would exist as to this issue.

However, there was contact between Vent's van and Williamson. According to Williamson, "I had my left hand on the hood of the van, and— and my knees, or my legs were in contact with the bumper, and I may have been—I don't know I may have kind of gone up on my tiptoes, trying to lean forward I guess." [72] He went on to say, "Well, I felt my feet sliding as the van pushed against my shins, and at that instant is when I shot." [73] In her deposition, witness Jennifer Grundy stated, "And so I saw the van touch him at that time . . . so I could see that his hand touched that, and I saw that he was lifting up, because he got taller ... but I saw him get higher, and I saw his arm up on the hood as he went up." [74] But when asked if she actually saw the van touch Williamson's legs, hips, stomach, or feet, she stated, "I don't think so." [75] Thus, even though there was contact between the van and Williamson,

this contact was not of the type to cause serious physical injury, as evidenced by Williamson's ability to step away from the vehicle after he shot Vent, as the vehicle lurched forward.[76] This evidence does not lead the Court to conclude, as a matter of law, taking the evidence in the light most favorable to Plaintiff, that Defendant had probable cause to believe that Vent poised an immediate risk of serious harm to himself.

Further, the Court cannot conclude, as a matter of law, that a reasonable officer would have believed that there was probable cause that Vent posed a threat of death or serious physical injury to others. All traffic was stopped at the intersection and Williamson did not know of anyone in danger from the van.[77] While Williamson had observed the van driving recklessly earlier, he had not seen or heard on the radio about any close calls or near misses involving other motorists or pedestrians.[78] At the intersection, he witnessed Vent's van scrape a stopped car, but there is no evidence that this put the driver of the stopped car in any danger.[79] Williamson argued that if he did not stop Vent at that intersection, "to the best of his knowledge, [there] was an open road for more of Mr. Vent's reckless, dangerous driving." [80] However, mere speculation does not show objective danger to others.[81]

---

71. Clerk's Docket No. 26 at Ex. 5, 9.

72. Clerk's Docket No. 20 at Williamson Depo. 105.

73. *Id.* at 110.

74. *Id.* at Grundy Depo. 20–21.

75. Clerk's Docket No. 26 at Ex. 2, 10.

76. *See id.* at Ex. 5, 14.

77. *See Harris v. Roderick,* 126 F.3d 1189, 1204 (9th Cir.1997) ("Law enforcement offi-

cials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed.").

78. Clerk's Docket No. 26 at Ex. 5, 11

79. Clerk's Docket No. 20 at Williamson Depo. 47.

80. *Id.* at 25.

81. *See Deorle v. Rutherford,* 272 F.3d 1272, 1281 (9th Cir.2001) ("'[A] simple statement by an officer that he fears for his safety or the

Therefore, a legitimate factual dispute exists as to whether Vent's Fourth Amendment right was violated.

## C. Clearly Established Rights

■ Although Randall has shown that there may have been a violation of a constitutional right, Williamson, nonetheless, is entitled to qualified immunity if that right was not clearly established at the time of the incident. When establishing whether a right is clearly established, the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." [82] The Supreme Court of the United States very recently made clear that the "relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." [83] As such, the focus in this inquiry is whether the officer had fair notice that his conduct was unlawful; "reasonableness is judged against the backdrop of the law at the time of the conduct. If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation." [84]

It is a general proposition that an officer's use of deadly force is reasonable only if the officer has probable cause to believe that the suspect poses an imminent threat of death or serious physical injury to the officer or others. [85] However, this general proposition is not enough to provide fair warning. [86] Here, the question must be whether, at the time of Williamson's actions, it was "clearly established" in the "specific context" of these facts that he was violating Vent's Fourth Amendment rights. The specific context confronting Williamson was a young man who had spent the past hour set on avoiding capture through vehicular flight, had put people at risk from that flight, and whose van advanced toward the officer.

The law at the time of the shooting involved only a few relevant decisions. In *Haugen*, the Supreme Court examined many of these decisions, finding that the cases as a whole "show that this area is one in which the result depends very much on the facts of each case." [87] As a result, the Supreme Court held that the officer's actions fell within the "hazy border between excessive and acceptable force," rather than within clearly established law. [88] The cases examined by the Supreme Court and the facts of *Haugen* are factually distinguishable from this case. One decision not considered by the Court, but heavily relied on by Randall, is *Acosta v. City and County of San Francisco*. [89] However, *Acosta* did not serve to clearly establish the law. Not only is *Acosta* fact-dependent, it also involved material factual disputes resulting in a jury verdict. [90] While the *Acosta* Court held that "the district court erred in concluding that a

safety of others is not enough; there must be objective factors to justify such a concern.").

**82.** *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

**83.** *Brosseau v. Haugen*, —— U.S. ——, 125 S.Ct. 596, 599, —— L.Ed.2d —— (2004).

**84.** *Id.*

**85.** *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985); *Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir.1997).

**86.** *Haugen*, 125 S.Ct. at 599.

**87.** *Id.* at 600. The Brosseau shooting occurred in 1999, and so the relevant cases for Brosseau are also applicable to this decision.

**88.** *See id.*

**89.** 83 F.3d 1143 (9th Cir.1996)(denying qualified immunity to an officer who shot the driver of a slow-moving vehicle).

**90.** *Id.* at 1146.

reasonable officer in [this officer's] position could have reasonably believed that shooting at the driver of a slow-moving car was lawful,"[91] the procedural posture was very different from this case. Further, in *Haugen*, the Supreme Court reversed a denial of qualified immunity where the car had either just started or just begun to move.[92] Thus, whether the car was moving slowly or not moving at all is not dispositive on whether the use of deadly force is clearly established in cases such as this.

Randall also points to the Fairbanks Police Department Standard Operating Procedure regarding deadly force to establish that the law was clearly established.[93] However, this policy merely mirrors the general proposition established by *Garner* and does not take into account the more particularized context of this situation.[94] Thus, it cannot be enough to provide fair warning to Williamson.

Here, there are strong arguments that Williamson acted reasonably in his use of deadly force and equally compelling arguments that his use of force was unreasonable. At the time of the shooting, case law was heavily dependent on the specific facts of each case and no case squarely addressed the facts of this case. What this demonstrates is that the law was not clearly established, and that Williamson's actions fell in the "hazy border between excessive and acceptable force."[95] This is true regardless if the van was stopped or moving slowly, and therefore summary judgment remains appropriate.

## IV. CONCLUSION

Because the law governing deadly force in these circumstances was not clearly established at the time of the shooting, the Court HOLDS that Williamson is entitled to qualified immunity. As such, it is not necessary for the Court to consider whether ALASKA STAT. § 09.65.210 bars recovery by Randall. A judgment of dismissal shall therefore enter as to Defendant Perry Williamson.

---

91. *Id.* at 1147.

92. *Haugen*, 125 S.Ct. at 598.

93. Clerk's Docket No. 26 at Ex. 3.

94. *See Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).

95. *Haugen*, 125 S.Ct. at 600 (citation omitted).