Sharon **MARTINEZ**, Individually and as parent and next friend of Rose Martinez, Plaintiff–Appellant,

v.

Polly **MAFCHIR**, Lou Gallegos, Jack Callahan, Roberto Samora, Rosemary Roybal, and Audrey Druva, in their individual capacities, Defendants–Appellees.

No. 93–2007.

United States Court of Appeals, Tenth Circuit.

Sept. 27, 1994.

Fred Abramowitz, and Elizabeth E. Simpson, of Tomita & Simpson, P.C., Albuquerque, NM, for plaintiff-appellant.

Judith C. Herrera and Michael D. Baird, of Herrera, Baird & Long, P.A., Santa Fe, NM, for defendants-appellees.

Before ANDERSON, McKAY, and TACHA, Circuit Judges.

TACHA, Circuit Judge.

Plaintiff Sharon Martinez filed an action under 42 U.S.C. § 1983 alleging Fourteenth Amendment substantive and procedural due process violations arising out of defendants' actions in pursuing a neglect and abuse petition seeking legal custody of her daughter, plaintiff Rose Martinez. The district court granted defendants' summary judgment motion. Plaintiffs appeal. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.[1]

## I. Background

### A. Facts[2]

On January 12, 1988, four-year-old Rose Martinez was sexually abused and raped by Leroy Boylan, a thirteen-year-old neighbor boy who was staying at the Martinez house. Rose's mother, Sharon Martinez, became aware of the sexual assault that same night, and after hearing Rose's complaints of pain and finding blood in Rose's underwear, she gave Rose a hot bath and examined her vagina for injuries. Seeing no signs of physical injury, Ms. Martinez decided not to seek medical treatment for Rose. The following day, January 13, 1988, Ms. Martinez informed Leroy's father, Mike Boylan, about the sexual assault, and he in turn related the incident to his wife, Linda Boylan. Ms. Martinez did not inform any public authorities about the assault.

---

1. After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed.R.App.P. 34(a); 10th Cir.R. 34.1.9. The case is therefore ordered submitted without oral argument.

2. Plaintiffs have filed a motion to strike defendants' supplemental appendix. We deny the motion because the materials in defendants' supplemental appendix merely correct and clarify factual misstatements in plaintiffs' appellate brief. *See* Fed.R.App.P. 10(e) ("If anything material to either party is omitted from the record by error or accident or is *misstated* therein, ... the court of appeals, on proper suggestion or of its own initiative, may direct that the omission or misstatement be corrected, and if necessary that a supplemental record be certified and transmitted.") (emphasis added).

Approximately one week after the incident, Ms. Martinez discovered a discharge in Rose's underwear and notice that Rose was experiencing vaginal irritation. She called to make an appointment with Dr. Gerald Rodriguez. Dr. Rodriguez examined Rose a week later on January 27, 1988. He found that Rose had suffered no tears, lacerations or abrasions to the pubic area, he tested Rose for venereal disease, and he prescribed a vaginal cream.

The Social Services Division of the New Mexico Human Services Department ("HSD") learned of the sexual molestation on January 19, 1988, when Linda Boylan brought the incident to HSD's attention at an unrelated detention hearing for Leroy. The next day, January 20, 1988, Polly Mafchir, a social worker for HSD, went to the Martinez home but found no one there. In response to a note left by Ms. Mafchir, Ms. Martinez went to Ms. Mafchir's office to meet with her on January 28, 1988. While there, Ms. Martinez quickly became upset with Ms. Mafchir and complained to her supervisor, defendant Rosemary Roybal. Ms. Martinez eventually calmed down and informed Ms. Mafchir and Ms. Roybal about the sexual assault and Rose's visit to Dr. Rodriguez's office. She indicated that Rose's behavior had changed since the assault and acknowledged that Rose needed to talk about the incident. Ms. Mafchir encouraged Ms. Martinez to take Rose to the Rape Crisis Center for a psychological assessment.

Ms. Martinez later called the Rape Crisis Center, but decided not to take Rose there because she did not like the Center's assessment procedures. Ms. Mafchir testified that following her discussion with Ms. Martinez she called Dr. Rodriguez and he told her in effect that Ms. Martinez was an irresponsible parent.

On February 25, 1988, Ms. Mafchir visited the Martinez residence with Deputy Judy Newsome of the Santa Fe County Sheriff's Department to investigate the sexual assault of Rose. Inside the Martinez home, they observed marijuana plants and were troubled that Rose was wearing "long feather-type earrings" and makeup that was not "childishly applied," but rather had an adult-like appearance. Ms. Mafchir told Ms. Martinez that HSD would pay for Rose's psychological

evaluation and she suggested that Ms. Martinez take Rose to a private counselor named Margo Bryce. Ms. Martinez agreed to do this.

On February 26, 1988, Ms. Martinez again took Rose to Dr. Rodriguez's office because Rose continued to have a malodor and slight discharge. Believing that a foreign object might be causing the discharge, Dr. Rodriguez scheduled a hospital visit for Rose so that he could surgically examine her. Because general anesthesia would be used, Dr. Rodriguez instructed Ms. Martinez not to feed Rose the morning of her surgery. The scheduled procedure had to be canceled twice, however, because Rose awoke early and ate breakfast. Rose eventually spent the night at the hospital to ensure that she would not eat before the procedure. Dr. Rodriguez performed the procedure and no foreign objects were found.

Ms. Roybal discussed the Martinez case with Ms. Mafchir throughout Ms. Mafchir's investigation. On April 11, 1988, Ms. Mafchir and Ms. Roybal filed a Uniform Case Record in which they recommended that HSD take affirmative action in the case. Then, on April 28, 1988, a children's court attorney named Catherine Aguilar filed in the Children's Court Division of the First Judicial District Court in the State of New Mexico a Neglect/Abuse Petition ("Neglect Petition") which had been prepared by Ms. Mafchir. The Neglect Petition outlined the facts set forth above, concluded that Rose was neglected and requested legal custody of Rose.

At the time the Neglect Petition was filed Ms. Mafchir believed that Rose's medical needs had been met, though in an untimely fashion, and that she was not in any immediate danger. Ms. Mafchir testified, however, that she believed Rose's psychological needs had not been met and that Ms. Martinez had failed to heed her suggestions to seek psychological counseling for Rose at the Rape Crisis Center or with Margo Bryce. Ms. Mafchir and Ms. Roybal both testified that this was an unusual case because, though HSD sought legal custody, HSD was not seeking Rose's physical removal from the Martinez home. Rather, HSD pursued the

Neglect Petition (1) to enlist the court's help to ensure Ms. Martinez would follow through with the recommended psychological evaluations for Rose, and (2) to receive court approval for HSD payment for the evaluations.

On May 2, 1988, a guardian ad litem was appointed for Rose and a Notice of Setting was filed scheduling a hearing on the Neglect Petition for May 10, 1988. A hearing was held on that date, but Ms. Martinez was not present because she had not been served with the Neglect Petition and she did not receive notice of the hearing. At the hearing, the court awarded temporary physical and legal custody of Rose to the state, but ordered that physical *placement* of Rose remain with her mother, pending adjudication. Rose was never physically separated from her mother. The court placed its findings and conclusions in a Custody Hearing Order and mailed a copy to Ms. Martinez via certified mail on May 12, 1988.

On May 23, 1988, Audrey Druva replaced Ms. Mafchir as the social worker in the Martinez case. A week later, Ms. Martinez found copies of some court pleadings, including the Neglect Petition, in an envelope taped to her door. Ms. Martinez complained the next day to Ms. Mafchir's new supervisor, defendant Roberto Samora, about Ms. Mafchir's conduct and the filing of the Neglect Petition.

In August 1988, after an adjudicatory hearing, the parties agreed to dismiss the Neglect Petition on the condition that Ms. Martinez cooperate in arranging and participating in a psychological evaluation paid for by HSD. She complied and the Neglect Petition was dismissed on November 23, 1988.

**B. Procedure**

On April 17, 1991, plaintiffs filed an action under 42 U.S.C. § 1983 alleging that defendants violated their Fourteenth Amendment substantive due process right to familial integrity by investigating and pursuing the

Neglect Petition without just cause. Plaintiffs also asserted that defendants violated their procedural due process rights by failing to provide Ms. Martinez with notice of the Neglect Petition hearing. The district court granted defendants' motion for summary judgment on both claims.

With respect to the substantive due process claim, the district court determined that defendants were entitled to qualified immunity because their actions did not violate any clearly established constitutional right. As to plaintiffs' procedural due process claim, the court held that defendants were entitled to summary judgment because they had no responsibility to provide Ms. Martinez with notice. Plaintiffs now appeal arguing that the district court erred in granting defendants' summary judgment motion.[3]

## II. Discussion

### A. Substantive Due Process Claim

■ Plaintiffs first assert that the district court erred in finding that defendants are entitled to qualified immunity on plaintiffs' substantive due process claim. "Qualified immunity is a question of law and the standard of review is de novo." *Yvonne L. v. New Mexico Dep't of Human Servs.,* 959 F.2d 883, 891 (10th Cir.1992).

■ "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see also Pueblo Neighborhood Health Ctrs., Inc. v. Losavio,* 847 F.2d 642, 645 (10th Cir.1988). In *Siegert v. Gilley,* 500 U.S. 226, 231–33, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991), the Supreme Court "clarif[ied] the analytical structure under which a claim of

3. This appeal presumably relates only to the actions of defendants Polly Mafchir, Rosemary Roybal and Roberto Samora. In plaintiffs' complaint, they named as defendants Polly Mafchir, Lou Gallegos, Jack Callahan, Roberto Samora, Rosemary Roybal and Audrey Druva. (Jack Callahan was the Director of the Social Services Division of HSD and Lou Gallegos was the Sec-

retary of HSD at all times material to this suit.) In their Response to Defendants' Motion for Summary Judgment, however, plaintiffs agreed to the dismissal of defendants Lou Gallegos, Jack Callahan and Audrey Druva because discovery did not substantiate any wrongdoing on their part.

qualified immunity should be addressed." To reach the question of whether a defendant official is entitled to qualified immunity, a court must first ascertain whether the plaintiff has sufficiently asserted the violation of a constitutional right at all. *Siegert,* 500 U.S. at 231–33, 111 S.Ct. at 1793; *see Donovan v. City of Milwaukee,* 17 F.3d 944, 947 (7th Cir.1994); *Maldonado v. Josey,* 975 F.2d 727, 729 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1266, 122 L.Ed.2d 662 (1993). If the plaintiff has asserted the violation of a constitutional right, the court must then determine whether that right had been clearly established so that a reasonable official in the defendant's situation would have understood that his conduct violated that right. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); *Donovan,* 17 F.3d at 947.

■ Plaintiffs assert that the defendants' alleged improper conduct violated their substantive due process right to familial integrity. Defendants argue to the contrary. The Supreme Court has recognized in various situations an abstract fundamental liberty interest in familial integrity. *Lehr v. Robertson,* 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983); *Lassiter v. Department of Social Servs.,* 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981); *Smith v. Organization of Foster Families for Equality & Reform,* 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977); *Spielman v. Hildebrand,* 873 F.2d 1377, 1383 (10th Cir.1989); *Kickapoo Tribe of Oklahoma v. Rader,* 822 F.2d 1493, 1497 (10th Cir.1987). The right to familial integrity, however, has never been deemed absolute or unqualified. *See, e.g., Lehr,* 463 U.S. at 256, 103 S.Ct. at 2990–91 (relationship between parent and child merits constitutional protection in "appropriate cases"); *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944) ("the family itself is not beyond regulation in the public interest"). Indeed, the state itself has a compelling interest in the health, education and welfare of children. *See, e.g., Santosky v. Kramer,* 455 U.S. 745, 766, 102 S.Ct. 1388, 1401, 71 L.Ed.2d 599 (1982) (state has *parens patriae* interest in welfare of child); *Wisconsin v. Yoder,* 406 U.S. 205, 213, 92 S.Ct. 1526, 1532, 32 L.Ed.2d 15 (1972) (state has "high responsibility for education of its citizens");

*see also Frazier v. Bailey,* 957 F.2d 920, 930 (1st Cir.1992) (citing *Santosky* and *Yoder*).

Courts have recognized that the constitutional right to familial integrity is amorphous and always must be balanced against the governmental interest involved. *See Hodge v. Jones,* 31 F.3d 157, 163–64 (4th Cir.1994); *Frazier,* 957 F.2d at 931; *Baker v. Racansky,* 887 F.2d 183, 187 (9th Cir.1989); *Hodorowski v. Ray,* 844 F.2d 1210, 1217 (5th Cir.1988); *see also Melton v. City of Oklahoma City,* 879 F.2d 706, 729 (10th Cir.1989) (where balancing of interests is required "the law is less likely to be well established than in other cases"), *cert. denied,* —— U.S. ——, 112 S.Ct. 296, 116 L.Ed.2d 241 (1991). As a result, the *Siegert* framework has proved difficult to apply in child abuse cases involving the generalized constitutional right to familial integrity because the threshold constitutional violation analysis may run together with the "clearly established" analysis. *See, e.g., Doe v. Louisiana,* 2 F.3d 1412, 1417 (5th Cir.1993) (blending constitutional violation analysis with clearly established law analysis), *cert. denied,* —— U.S. ——, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994); *Frazier,* 957 F.2d at 921–22 (same). Nevertheless, we undertake to apply the *Siegert* framework here. In the context of this case, we must first determine whether Ms. Mafchir's actions in pursuing the Neglect Petition, not to seek Rose's actual physical removal from the Martinez home but basically to force Ms. Martinez to follow through with the recommended psychological evaluations for Rose, rose to the level of a constitutional violation.

Social workers face extreme difficulties in trying simultaneously to help preserve families and to serve the child's best interests. *See Baker,* 887 F.2d at 187. Ms. Mafchir was in possession of the following facts at the time she prepared the Neglect Petition: (1) four-year-old Rose had been raped by a neighbor boy who was staying at the Martinez residence; (2) Ms. Martinez did not seek medical treatment the night of the sexual assault even though Rose complained of vaginal pain and had blood on her underwear; (3) Ms. Martinez told Leroy's father of the assault but did not inform public authorities about the incident; (4) Ms. Martinez did

not take Rose to be examined by Dr. Rodriguez until two weeks after the assault and approximately one week after Rose experienced irritation and discharge; (5) Dr. Rodriguez effectively told Ms. Mafchir that Ms. Martinez was an irresponsible parent; (6) Ms. Mafchir and Deputy Newsome observed marijuana in the house and saw Rose wearing long feather earrings and makeup that had an adult-like appearance; (7) Ms. Martinez missed two appointments to have Rose examined under general anesthesia because Rose had eaten the morning of the scheduled procedure; (8) Rose's behavior had changed since the sexual assault and Ms. Martinez acknowledged that Rose needed to talk about the incident; (9) despite Ms. Mafchir's suggestions, Ms. Martinez failed to take Rose for psychological counseling as she had promised to do; and (10) Rose's medical needs had been met and she was not in any immediate danger. Though these facts lend themselves to different interpretations when viewed separately or with hindsight, given the above circumstances in their entirety a reasonable social worker at the time could have believed that Ms. Martinez was neglecting Rose's serious psychological needs.[4]

Though Ms. Martinez undoubtedly suffered anxiety between the time temporary legal custody was awarded to the state and the time the Neglect Petition was dismissed, we again point out that Rose never was removed physically from her mother. When she filed the Neglect Petition based on Rose's perceived need for psychological counseling, Ms. Mafchir apparently was attempting to comply with the dual objectives of preserving the family unit and pursuing the child's best interest. Considering that Rose was the victim of sexual abuse, the facts surrounding her home environment and the details related to Ms. Martinez's inattentive attitude regarding Rose's psychological and medical treatment, Ms. Mafchir's actions placed the state's interest in protecting the child's well being in a higher priority position than the counterbalancing interest in familial integrity. Under the circumstances of this case, the two interests simply cannot lie in equipoise. By pursuing the state's interest in the child, Ms. Mafchir did not violate the Constitution by temporarily compromising the right to familial integrity. We find that Ms. Mafchir's action in filing the Neglect Petition, although arguably extreme for its purpose, did not violate any constitutional right to which Ms. Martinez is entitled.

Plaintiffs' § 1983 substantive due process claim against Ms. Roybal and Mr. Samora is based solely on their supervision of Ms. Mafchir's investigation and pursuit of the Neglect Petition. Because Ms. Mafchir did not violate plaintiffs' constitutional right to familial integrity, neither did Ms. Roybal nor Mr. Samora. *See, e.g., Meade v. Grubbs,* 841 F.2d 1512, 1527–28 (10th Cir.1988) (no supervisory liability attaches without an underlying constitutional violation).

**B. Procedural Due Process Claim**

■ Unlike the nebulous substantive due process right to familial integrity, it cannot be denied that a parent's procedural due process right to receive notice prior to a child custody hearing is a clearly established right of which a reasonable official should have known. *See Application of Gault,* 387 U.S. 1, 33–34, 87 S.Ct. 1428, 1446–47, 18 L.Ed.2d 527 (1967); *Kickapoo,* 822 F.2d at 1497. The district court, however, did not hold that Ms. Martinez's procedural due process rights had not been violated. To the contrary, pointing out that Ms. Martinez did not receive notice of the Neglect Petition hearing, the court found it "strange, even shocking," that "custody of a parent would be ordered removed at a hearing at which the parent was not present and no exigent circumstances existed." The district court nevertheless held that summary judgment was appropriate because Ms. Mafchir and her supervisors had

---

4. The New Mexico Children's Code's definition of a "neglected child" is subject to broad interpretation and arguably encompasses situations where the child's psychological needs are neglected. The Children's Code defines a "neglected child" as a child:

> who is without proper parental care and control or subsistence, education, medical *or other*

> care or control necessary for the child's well-being because of the faults or habits of the child's parent, guardian or custodian or the neglect or *refusal of the parent,* guardian or custodian, when able to do so, to provide them.

N.M.Stat.Ann. § 32A–4–2.C(2) (emphasis added).

no responsibility to provide Ms. Martinez with notice.[5] Thus, this appears to be the unusual case in which we must decide the factual issue of whether *these defendants* violated plaintiffs' procedural due process rights.

The district court analyzed the New Mexico Children's Code and concluded that "[a] fair implication from the Children's Code's structure and language, especially in light of the customary practice of law, is that the attorney who files the petition is responsible for seeing that the summons is issued and served with a copy of the petition." Further, the court noted that "[n]o statute or other law charges the social worker or the social worker's supervisor with the duty of serving the petition." The district court also looked to Ms. Mafchir's deposition testimony. In response to questioning, she testified as follows:

Q. Was it your responsibility to see that the papers had been served?

A. No.

Q. As the investigative worker, do you normally have responsibility for any service?

A. No.

Q. Who has that responsibility?

A. The Sheriff's Department.

Q. Is that something you assign, or is that something the attorney assigns?

A. The attorneys. I don't have anything to do with that.

Q. Okay.

A. The attorneys—I don't know whether it's the attorneys or the Court, honestly.

▇▇▇▇ Plaintiffs' sole argument on appeal is that deposition testimony of Catherine Aguilar, the children's court attorney who filed the Neglect Petition, creates a material fact as to whether Ms. Mafchir had responsibility for providing Ms. Martinez with notice of the Neglect Petition hearing, thus precluding summary judgment on plaintiffs' procedural due process claim.[6] Plaintiffs rely on the following excerpt from Catherine Aguilar's testimony to support their assertion:

Q. I don't know what you're looking at, but why are you laughing?

A. Well, apparently the Department may have served the wrong person. I apparently wrote a memo to [Ms. Mafchir] about—Apparently somebody sent me back the Summons saying, "You served me, and I'm not Sharon Martinez." And so I wrote a memo to the social worker saying that I had received this back and to please talk to me about this service.

Q. Who is responsible for seeing to it that service is done in these cases?

A. The social workers normally—although we sent—Because of the ten-day rule, it was often—it was a race to see how we could get clients served as soon as possible. Most of the time, we took our service of process to the Sheriff's Office to get served. And I believe the social workers did that actual delivery to the Sheriff's Office.

We find that this testimony does not create a genuine issue of material fact regarding Ms. Mafchir's responsibility for providing Ms. Martinez with notice.

Ms. Mafchir clearly testified she was not responsible for service of the summons and the petition, but that the children's court attorneys were responsible for assigning the Sheriff's Department to effect service. Cath-

---

**5.** Plaintiffs incorrectly assert that the district court sua sponte concluded that defendants were not responsible for providing Ms. Martinez with notice. Defendants brought this issue to the district court's attention by stating in their Motion for Summary Judgment that "[t]hese defendants did not deny plaintiff procedural [due] process" and then by arguing in their Memorandum in Support of Motion for Summary Judgment that they "were not responsible for serving the Petition."

**6.** Catherine Aguilar's deposition testimony was not part of the record below and therefore was not considered by the district court. Normally we do not consider on appeal materials not furnished to the district court. *Creason v. American Bridge,* 384 F.2d 475, 478 (10th Cir.1967); *see also Henn v. National Geographic Soc'y,* 819 F.2d 824, 831 (7th Cir.), *cert. denied,* 484 U.S. 964, 108 S.Ct. 454, 98 L.Ed.2d 394 (1987). In this case, however, we grant plaintiffs' motion to supplement the record with Ms. Aguilar's deposition testimony. Defendants did not oppose the motion, and further, as we determine above, even had Ms. Aguilar's testimony been part of the original record it would not have created any material factual issue regarding Ms. Mafchir's responsibility to provide Ms. Martinez with notice.

erine Aguilar's testimony, that social workers "normally" are responsible for "seeing to it that service is done" and that "the social workers did that actual delivery to the Sheriff's Office" in this case, does not contradict Ms. Mafchir's testimony. Rather, Catherine Aguilar's testimony merely adds to Ms. Mafchir's testimony by showing that Ms. Mafchir had assumed the function of *delivering* service papers to the Sheriff's Office, not that she was responsible for ensuring that Ms. Martinez received notice.

In fact, all the evidence, including Catherine Aguilar's testimony itself, indicates that the children's court attorney retained responsibility for ensuring Ms. Martinez actually received notice. Catherine Aguilar stated that "someone sent *me* back the Summons ... [a]nd so *I* wrote a memo to the social worker saying that *I had received this back* and to *please talk to me* about this service." Ms. Mafchir's entry in the Martinez casefile after the hearing also shows the children's court attorney retained responsibility for overseeing service of process. On May 16, 1988, Ms. Mafchir wrote: "Memo *from* Legal *to ask us* to provide service of process of Sharon Martinez. Sheriff's office has not been taking care of this service on a number of our cases lately." Further, no statute charges social workers with the responsibility for providing notice. As the district court noted, the New Mexico Children's Code provides that parents must be served, *see* N.M.Stat.Ann. § 32A–1–12 ("summonses shall be issued ... to the parent" requiring the parent to appear before the court to answer the allegations of the petition); N.M.Stat.Ann. § 32A–1–13 ("the summons shall be served upon the party" at least forty-eight hours before the hearing), but does not make clear where responsibility for providing that notice rests, though a "fair implication from the Children's Code's structure and language, especially in light of the customary practice of law, is that the [children's court] attorney who files the petition" bears that burden.

We also point out that Ms. Mafchir fulfilled any duty she had regarding the function of *delivering* the Neglect Petition to the Sheriff's Office. Ms. Mafchir's notes indicate (and it is undisputed) that the Petition was delivered to the Sheriff's Department prior to the May 10, 1988 hearing. Ms. Mafchir's actions during and after the hearing also demonstrate that she acted responsibly. When Ms. Martinez failed to appear at the May 10, 1988 hearing, the judge asked Ms. Mafchir to call the Sheriff's Department to inquire whether Ms. Martinez had been served. Upon making the call, Ms. Mafchir learned that Ms. Martinez had not been served. Mafchir then told the children's court attorney and the attorney in turn informed the judge, who proceeded with the hearing despite Ms. Martinez's absence. After the hearing, when specifically asked by the children's court attorney to assume the responsibility of overseeing service of process, Ms. Mafchir's May 19, 1988, entry in the case file—"Memo sent to Legal that I spoke with Ramona, a process server at Sheriff's office. She promised to serve papers today"—indicates that Ms. Mafchir acted diligently.

Like the district court, we find it shocking that the hearing on the Neglect Petition proceeded in Ms. Martinez' absence. However, we are called upon to decide only whether *these defendants*—Ms. Mafchir and her supervisors—were responsible for serving Ms. Martinez with notice. Because Ms. Aguilar's testimony creates no material fact regarding this issue, defendants are entitled to summary judgment on plaintiffs' procedural due process claim because they did not violate plaintiffs' constitutional rights.

### III. Conclusion

Defendants are entitled to summary judgment on plaintiffs' substantive due process claim because they did not violate the right to familial integrity. Plaintiffs' procedural due process claim fails because these defendants were not responsible for providing Ms. Martinez with notice of the Neglect Petition hearing and therefore did not violate plaintiffs' right to procedural due process. **AFFIRMED.**