60 F.3d 505
 Edward J. MANZANO, Jr., Appellee,
v.
SOUTH DAKOTA DEPARTMENT OF SOCIAL SERVICES; James W.
Ellenbecker, in his individual and official capacity as
Director of the Department of Social Services; Pia Wilkins,
in her individual and official capacity with the Department
of Social Services; Nancy Fleming, in her individual and
official capacity with the Department of Social Services;
Susan Walsh, in her individual and official capacity with
the Department of Social Services; Defendants-Appellants,
Pennington County, South Dakota, a local governmental body;
Pennington County Sheriff's Department; Don Holloway, in
his individual and official capacity as Pennington County
Sheriff; Lynn McLane, in her individual and official
capacity with the Pennington County Sheriff's Department,
jointly and severally, Defendants.
Edward J. MANZANO, Jr., Appellee,
v.
SOUTH DAKOTA DEPARTMENT OF OF SOCIAL SERVICES; James W.
Ellenbecker, in his individual and official capacity as
Director of the Department of Social Services; Pia Wilkins,
in her individual and official capacity with the Department
of Social Services; Nancy Fleming, in her individual and
official capacity with the Department of Social Services;
Susan Walsh, in her individual and official capacity with
the Department of Social Services; Pennington County, South
Dakota, a local governmental body; Pennington County
Sheriff's Department; Don Holloway, in his individual and
official capacity as Pennington County Sheriff; Defendants,
Lynn McLane, in her individual and official capacity with
the Pennington County Sheriff's Department,
jointly and severally, Defendant-Appellant.
 Nos. 94-1572, 94-2494.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 16, 1994.
Decided July 25, 1995.
 
 Eric Rasmussen, Brookings, SD, argued for the Department of Social Services, et al. in 94-1572.
 Donald Knudsen, Rapid City, SD, for Lynn McLane.
 Gregory A. Eiesland, Rapid City, SD, argued, for appellee.
 Before McMILLIAN, Circuit Judge, JOHN R. GIBSON, Senior Circuit Judge, and WOLLMAN, Circuit Judge.
 McMILLIAN, Circuit Judge.
 
 
 1
 In this consolidated appeal, four officials of the South Dakota Department of Social Services (SDDSS) and a deputy with the Pennington County, South Dakota Sheriff's Department (collectively referred to as "appellants") appeal two orders entered in the United States District Court for the District of South Dakota denying their respective motions for summary judgment based on qualified immunity. For reversal, appellants argue that the district court erred in denying their motions for summary judgment because: (1) their actions did not violate a constitutional right; (2) the constitutional right asserted was not clearly established at the time of the alleged violation; and (3) there was no genuine issue of material fact as to the objective reasonableness of their conduct. For the reasons discussed below, the judgment of the district court is reversed.
 
 I.
 
 2
 Ed Manzano and Kathleen Brooks were married in 1987. On May 28, 1988, their only child, Abigail Manzano, was born. Manzano and Brooks were divorced on January 18, 1990. Manzano is an officer in the United States Air Force, and Brooks is a registered nurse. The divorce decree gave them joint custody of Abigail. Brooks had primary physical custody, and Manzano had extensive visitation rights. Since the divorce decree was entered, Brooks and Manzano have had intermittent problems concerning visitation. Upon returning home after a visit with her father in September of 1991, Abigail allegedly made statements to Brooks and Brooks' boyfriend which Brooks interpreted to mean that the child had been sexually abused by Manzano. On September 23, 1991, Brooks contacted SDDSS and reported her concern. On September 24, 1991, a social worker with SDDSS, Pia Wilkins, called Lynn McLane, an investigator with the Pennington County Sheriff's Department, to discuss the Manzano report. McLane and Wilkins visited with Brooks at SDDSS offices on September 26, 1991. Wilkins and McLane also spoke with Abigail. In this first interview, Abigail, then age three, repeatedly denied that anyone had ever touched her improperly or made her vaginal area sore. On that same day, Manzano, who was unaware of Brooks's contact with SDDSS, filed a motion to modify visitation rights in state court because he claimed that Brooks had previously taken Abigail out of South Dakota and thereby denied him his allotted time with the child.
 
 
 3
 A few days later, Brooks called McLane and told her that Abigail wanted to speak with her again, and on October 1, 1991, Wilkins and McLane interviewed Abigail. In this second interview, Abigail told Wilkins and McLane that Manzano told her not to tell what happened to her. She also told them that Manzano made her vaginal area sore by "stick[ing] his finger way in." When she was asked why he did that, she answered, "Because I didn't want him to." She stated that these things happened when they went camping. Joint Appendix at 1001-05. After this interview, McLane advised Brooks to get a temporary protection order which could keep Manzano away from Abigail. On that same day, Brooks filed a verified petition with the state court seeking such an order. It is undisputed that neither McLane nor Wilkins assisted Brooks in the preparation of this petition. In the petition, she alleged that Abigail had begun making statements which suggested Manzano had sexually abused her as early as April or May of 1991 and that Abigail also exhibited physical signs of vaginal irritation such as redness and a strong odor. Brooks also alleged that when she and Manzano were married, he once told her that "if he wanted to abuse his daughter he would put his finger in her vagina and rub it until it was red." Joint Appendix at 280. Brooks further stated that "professionals" advised her to seek the protection order. The ex parte temporary protection order which prohibited any visitation by Manzano was issued the next day, October 2, 1991, by the state court based solely on "the uncorroborated sex abuse allegation" made by Brooks. Joint Appendix at 285. A hearing was then scheduled for October 28, 1991.
 
 
 4
 Upon Wilkins' recommendation, Brooks took Abigail for a physical examination on October 8, 1991. Dr. Lori Strong examined the child and found no physical evidence of abuse. Dr. Strong had previously examined Abigail in April 1991 and at that time as well she found no evidence of abuse. There were medical records, obtained by Wilkins, from an earlier doctor's appointment at Ellsworth Air Force Base which indicated that Abigail had vaginal irritation in December 1990. On October 9, 1991, Manzano was interrogated by McLane and Deputy Jerry Moore at the Pennington County Sheriff's Department. Manzano denied the accusations of abuse. Further, Manzano claimed that, in the petition for the protection order, Brooks mischaracterized his statement regarding child abuse. However, he did admit that he had told Brooks that if a person wanted to abuse a child, he or she would stick a finger inside the child.
 
 
 5
 On October 10, 1991, McLane and Wilkins interviewed Abigail for a third time. Unlike the prior two encounters, this interview was not tape-recorded. During this session, Abigail was presented with drawings of a young girl, an adult male, and a hand. According to McLane, when asked where Manzano touched her, Abigail pointed only to the vaginal and anal areas. McLane asked Abigail to mark on a hand outline with what part Manzano had touched her, and she marked three fingers. McLane also presented Abigail with the outline of an adult male, front view, and asked her to circle the parts with which Manzano had touched her. Abigail drew a large circle that included the stomach, upper thighs, genitalia, and one hand. McLane then asked her to put an "X" on the parts with which he had touched her, and she made an "X" on both thighs. McLane then asked Abigail to point to the parts of the body with which Manzano had touched her, and she pointed to the penis.
 
 
 6
 On October 15, 1991, a hearing was held in the divorce proceeding before the same judge who issued the temporary protection order. As a result, the state court ordered that Manzano be allowed supervised visitation with Abigail at the Department of Social Services office. In an order dated November 19, 1991, the state court granted Manzano two additional hours of supervised visitation per week, and granted Manzano's request to convert his previously filed motion to modify visitation into a motion to change custody. The state court further ordered that the Pennington County Sheriff's Office and the SDDSS appear in person or in writing on November 25, 1991, to advise the court as to its position regarding its pending investigation and its decision on how it will proceed. The state court required this information because it had suspended proceedings on the custody dispute pending the conclusion of the agencies' investigation. Joint Appendix at 1018-20. The record is unclear as to the agencies' response to this request.
 
 
 7
 On October 17, 1991, Wilkins discussed the Manzano case with Deputy State's Attorney Jay Miller. It was Miller's belief that, without corroborating medical evidence, the case would be difficult to prosecute. On the following day, Wilkins wrote a letter to Ron Campbell, an attorney for SDDSS, informing him of her opinion that Abigail had been sexually abused by Manzano and of the possibility that the State's Attorney office might not prosecute the case. On April 24, 1992, a representative of the SDDSS contacted Miller and discussed a possible Abuse and Neglect Petition against Manzano. Separately, on April 27, 1992, McLane forwarded a warrant request to Pennington County State's Attorney Dennis Groff asking that Manzano be charged with one count of first degree rape. On May 5, 1992, Miller interviewed Abigail, and on May 11, 1992, a summons and petition alleging abuse and neglect against Manzano was served on his attorney. This petition was dismissed by the State's Attorney office on July 6, 1992. Manzano was never arrested nor charged with any crime involving Abigail. Manzano was never questioned by SDDSS personnel regarding the alleged sexual abuse, and was interviewed by McLane only once on October 10, 1991.
 
 
 8
 Manzano's weekly visits were supervised by SDDSS from October 1991 through May 1992. The record unfortunately does not provide a very clear picture of the events of that time period. On February 18, 1992, Brooks notified Manzano that she would be leaving the state for approximately ten days to look for employment and that Abigail would accompany her. Manzano asked for permission to keep the child while Brooks was away. On February 25, 1992, Nancy Fleming, an SDDSS employee in part responsible for overseeing the investigation, wrote a letter to the state trial judge expressing strong opposition to Manzano's proposed unsupervised visitation. Apparently, this visitation did not take place. On March 2, 1992, the state court appointed Kay Lingren, M.S.W.,[1] to investigate the ongoing custody dispute and give a report and recommendation to aid the court in its resolution of Manzano's motion for change of custody. During this same time period, Abigail had weekly counseling sessions with Linda Holcomb, M.S.W. Holcomb periodically gave progress reports to SDDSS regarding Abigail's emotional condition.
 
 
 9
 In mid-May 1992, a four-day hearing was held in the divorce proceeding to consider the visitation and custody issues. At that hearing, Lingren testified that, among other things, the investigative work of the SDDSS was not thorough and lacked the requisite objectivity. In an order dated August 17, 1992, the state court concluded that sexual abuse had not been proven by a preponderance of the evidence. The state court found that Abigail's statements left much room for alternative interpretation and noted that even the experts who testified at the hearing reached widely varying views on the significance of Abigail's remarks. Further, the state court noted that there was no medical corroboration which would support the allegation of vaginal penetration. The state court found that both parents were mentally and physically healthy and equally equipped to prepare the child for responsible adulthood. The state court awarded primary physical custody to Brooks and set out a schedule of extensive unsupervised visitation for Manzano.
 
 
 10
 Following the resolution of the custody dispute, Manzano filed the instant civil rights action, pursuant to 42 U.S.C. Secs. 1983 and 1985, in federal district court against the SDDSS, James Ellenbecker, Director of the SDDSS, Nancy Fleming and Susan Walsh, SDDSS employees who supervised the Manzano investigation, and Wilkins ("SDDSS defendants"), and Pennington County, South Dakota, the Pennington County Sheriff's Department, Don Holloway, the sheriff, and McLane ("County defendants"). Manzano alleged that the defendant officials had impermissibly interfered with his Fourteenth Amendment liberty interest in the companionship of his daughter. He also alleged a number of pendent state law claims, which were subsequently dismissed by the district court. The SDDSS defendants moved for summary judgment on the basis of qualified immunity. This motion was cursorily denied by the district court because it found that there were material issues of fact as to whether defendants conducted themselves in an objectively reasonable manner in light of clearly established constitutional law. Manzano v. South Dakota Department of Social Services, Civ. No. 93-5024 (D.S.D. Jan. 23, 1994). The County defendants also moved for summary judgment on the basis of qualified immunity, and that motion was denied as well for the reasons stated in the district court's earlier order. Id. (May 13, 1994). The interlocutory appeals of the SDDSS defendants (No. 94-1572) and County defendant Lynn McLane (No. 94-2494) followed.
 
 II.
 
 11
 "Qualified or 'good faith' immunity is an affirmative defense that must be pleaded by a defendant official." Harlow v. Fitzgerald, 457 U.S. 800, 815, 102 S.Ct. 2727, 2736-37, 73 L.Ed.2d 396 (1982). In order to determine whether a defendant is entitled to qualified immunity, we engage in a two-part analysis. Boyd v. Knox, 47 F.3d 966, 968 (8th Cir.1995) (Boyd ), citing Munz v. Michael, 28 F.3d 795, 799 (8th Cir.1994); see Siegert v. Gilley, 500 U.S. 226, 231-32, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991) (Siegert ). First, we must determine whether the plaintiff has alleged the violation of a constitutional right. Boyd, 47 F.3d at 968. Second, we must determine whether that right was clearly established at the time of the alleged violation. Id.
 
 
 12
 For a constitutional right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). "This is not to say an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Id. The denial of a motion for summary judgment based on qualified immunity is immediately appealable under the collateral order doctrine. Reed v. Woodruff County, 7 F.3d 808, 810 (8th Cir.1993), citing Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1986). Our review is de novo. Henderson v. Baird, 29 F.3d 464, 467 (8th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 2584, 132 L.Ed.2d 833 (1995).
 
 
 13
 Manzano argues that appellants deprived him of his constitutionally protected interest in "familial relations with his daughter, Abigail, in violation of his substantive due process rights." Brief for Appellee at 25. Appellants do not dispute that parents have a protected liberty interest in familial integrity, but they contend that, in the present case, this right has not been violated because the countervailing state interest in the protection of the child's welfare justified their conduct.
 
 
 14
 Our court has recognized the liberty interest which parents have in the care, custody, and management of their children. Myers v. Morris, 810 F.2d 1437, 1462 (8th Cir.) (Myers ) (citing Lehr v. Robertson, 463 U.S. 248, 258, 103 S.Ct. 2985, 2991, 77 L.Ed.2d 614 (1983)), cert. denied, 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987); see Lux by Lux v. Hansen, 886 F.2d 1064, 1066-67 (8th Cir.1989) (Lux ); Fitzgerald v. Williamson, 787 F.2d 403, 407 (8th Cir.1983). However, we have at the same time indicated that this right is not absolute. Myers, 810 F.2d at 1462; see Martinez v. Mafchir, 35 F.3d 1486, 1490 (10th Cir.1994) (Martinez ) ("The right to familial integrity, however, has never been deemed absolute or unqualified."); accord Hodge v. Jones, 31 F.3d 157, 163 (4th Cir.) (Hodge ), cert. denied, --- U.S. ----, 115 S.Ct. 581, 130 L.Ed.2d 496 (1994); Doe v. Louisiana, 2 F.3d 1412, 1417 (5th Cir.1993) (Doe), cert. denied, --- U.S. ----, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994); Frazier v. Bailey, 957 F.2d 920, 929 (1st Cir.1993) (Frazier ). As we stated in Myers, "the liberty interest in familial relations is limited by the compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves." 810 F.2d at 1462. Moreover, as the First Circuit has correctly noted, "[t]he right to family integrity clearly does not include a constitutional right to be free from child abuse investigations." Watterson v. Page, 987 F.2d 1, 8 (1st Cir.1993) (Watterson ).
 
 
 15
 The need to continually subject the assertion of this abstract substantive due process right to a balancing test which weighs the interest of the parent against the interests of the child and the state makes the qualified immunity defense difficult to overcome. Moreover, the requirement that the right be clearly established at the time of the alleged violation is particularly formidable. See Martinez, 35 F.3d at 1490; Hodge, 31 F.3d at 164; Frazier, 957 F.2d at 930; Myers, 810 F.2d at 1462-63. Commenting on this problem, one district court has recently remarked that "[i]t is for this reason that many courts have found that, in context of child care workers investigating and bringing child abuse proceedings, there are no 'clearly established' substantive due process rights held by parents." Callahan v. Lancaster-Lebanon Intermediate Unit 13, 880 F.Supp. 319, 329 (E.D.Pa.1994). Our court has not gone so far as to say that there are no "clearly established" substantive due process rights held by parents in the context of child abuse investigations. However, in Myers, we did recognize the problem of defining such rights. 810 F.2d at 1462-63. More generally, this need to balance competing interests makes the Siegert approach difficult to apply in child abuse cases involving the right to familial integrity.[2] In these types of cases, it is nearly impossible to separate the constitutional violation analysis from the clearly established right analysis. See Martinez, 35 F.3d at 1490; Doe, 2 F.3d at 1417; Frazier, 957 F.2d at 929-931.
 
 
 16
 Our difficulty with the present case principally arises because we fail to see how the actions of the defendant state officials rose to the level of a constitutional violation, even when viewing the record in the light most favorable to Manzano. His parental rights were clearly disrupted, but it is not clear that this disruption was caused by the unreasonable or unconstitutional actions of state officials. Initially, Manzano makes much of the fact that, after the second interview with Abigail, McLane advised Brooks to seek a temporary protection order. He argues that this was done without a reasonable suspicion of child abuse, and McLane thereby unconstitutionally interfered with Manzano's relationship with his daughter.[3]
 
 
 17
 Manzano presumably employs the "reasonable suspicion" test because of our statement in Myers that "the parental liberty interest in keeping the family unit intact is not a clearly established right in the context of reasonable suspicion that parents may be abusing children." 810 F.2d at 1463. While that statement specifically addressed the propriety of the physical separation of children from parents by sheriff's deputies, we later applied this reasonable suspicion test to conclude that a social worker was immune from Sec. 1983 liability for her finding of sexual abuse which resulted in the institution of dependency and neglect proceedings against the child's father. Lux, 886 F.2d at 1066. Clearly, our precedents provide that, when a state official pursuing a child abuse investigation takes an action which would otherwise unconstitutionally disrupt familial integrity, he or she is entitled to qualified immunity, if such action is properly founded upon a reasonable suspicion of child abuse. Some incidental actions, taken in pursuit of a child abuse investigation, however, do not automatically rise to the level of a constitutional violation simply because they may not be supported by a reasonable suspicion of child abuse.
 
 
 18
 The Fifth Circuit in Stem v. Ahearn, 908 F.2d 1 (5th Cir.1990) (Stem ), cert. denied, 498 U.S. 1069, 111 S.Ct. 788, 112 L.Ed.2d 850 (1991), encountered a factual situation almost identical to the case presently before us. The Fifth Circuit described the strikingly similar circumstances in Stem as follows:
 
 
 19
 This civil rights action follows an acrimonious child-custody dispute, with one parent leveling charges of child molestation against her former husband. Child protective services workers investigated and concluded, despite medical evidence to the contrary, that the father had sexually abused his minor daughter. As a consequence of this investigation, the mother secured a temporary state court order certifying herself as the exclusive conservator of the child.
 
 
 20
 Enjoined by [sic] court-ordered visitation, the father was denied access to his daughter for over four months. He asserts constitutional claims against the child protective services workers, the investigative agency, and the county. Among other charges, the father maintains that his fundamental parental rights were terminated without due process of law and, independently, that the investigation of the alleged molestation was orchestrated negligently and impinged upon various constitutional guarantees.
 
 
 21
 Id. at 2. As in the present case, in Stem, the investigator concluded that the child was molested despite the lack of medical corroboration. Further, the investigator reached this conclusion without interviewing the father. The plaintiff argued that "the investigation of the charge of child molestation, raised by his estranged wife, was so grossly negligent that it served to terminate fundamental parental rights in contravention of the process minimally due under the Constitution." Id. at 3. Although Stem is vaguely cast in terms of procedural due process, we find its analysis instructive. In holding that the application of qualified immunity was appropriate, the court noted:
 
 
 22
 [Plaintiff] ignores the fact that his parental rights were impinged only after a judicial hearing at which he was fully heard. [Defendants] never physically removed [the] child from him or otherwise altered his parental rights under the law, although [a defendant] did testify in court concerning his investigatory conclusions and did advise the mother to keep the daughter away from the plaintiff.
 
 
 23
 Id. at 6. The court also recognized that with regard to any testimony given by the defendant-investigator, he would be entitled to absolute immunity from Sec. 1983 liability. Id., citing Briscoe v. LaHue, 460 U.S. 325, 342-47, 103 S.Ct. 1108, 1119-22, 75 L.Ed.2d 96 (1983) (holding witness testimony absolutely immune).
 
 
 24
 In Stem, the investigating agency itself petitioned to secure the court order conferring exclusive conservatorship on the mother, and the investigating agent advised the mother to keep the child away from the father. Still, the court found no due process violation. In the present case, McLane, in nearly the identical position as the investigator in Stem, merely advised Brooks to seek a temporary protection order. Manzano was denied visitation rights for approximately two weeks because of a petition filed by his former wife in their divorce proceeding. In this petition, Brooks recited her allegations of sexual abuse and then merely stated that "professionals" advised her to take this action. Furthermore, the temporary protection order which prohibited any visitation by Manzano was issued by the state court based solely on "the uncorroborated sex abuse allegation" made by Brooks. Joint Appendix at 285. At the time, McLane advised Brooks to seek the order, she had conducted two interviews of Abigail and one of Brooks. She and Wilkins then agreed that further investigation was warranted. Under these facts and in the absence of evidence of improper motive, we see no constitutional violation resulting from McLane's mere suggestion that Brooks seek available temporary judicial relief through her divorce proceeding. Further, the supervised visitation, which lasted from October 1991 to May 1992, was ordered by the state court only after a hearing in which Manzano fully participated. To the extent that the testimony of any of the SDDSS or County defendants affected the state court's decision to allow only supervised visitation from October 1991 through May 1992, that testimony was entitled to absolute immunity from civil rights liability and cannot influence our consideration of Manzano's constitutional claims.
 
 
 25
 At oral argument, counsel for Manzano cited, as support for his position, our recent decision in Ripson v. Alles, 21 F.3d 805 (8th Cir.1994) (Ripson ), in which we held that a police officer was not entitled to qualified immunity for his arrest of a parent who had allegedly sexually abused his daughter. Despite an absence of corroborating physical evidence and a directive from the county attorney to "keep investigating," the police officer arrested the child's father solely on the basis of the allegations of the child's mother and the corroborating statements of her boyfriend. Id. at 808. Further, the police officer was aware the divorced parents were in an ongoing custody dispute prior to the time of the arrest. Under these facts, we held that "a reasonable officer could not have believed probable cause existed for the arrest of [the father] for sexually abusing his daughter." Id.
 
 
 26
 Ripson is distinguishable for several reasons. In order for the arrest to have been lawful, it had to be founded on probable cause. Id. at 807. In the present case, we have not imposed the probable cause standard on McLane's suggestion that Brooks seek a temporary protection order, nor have we even applied the less rigorous reasonable suspicion test. While the reasonable suspicion requirement may apply to some aspects of child abuse investigations, see Myers, 810 F.2d at 1463; Lux, 886 F.2d at 1066, we do not think that McLane had to have a reasonable suspicion of child abuse before advising Brooks of her option to file a petition for a temporary protection order. As indicated above, in the absence of evidence of improper motive, we believe that McLane's mere recommendation, unaccompanied by further official action, was not an unconstitutional infringement upon Manzano's due process rights. Additionally, we note that in Ripson, the defendant was actually arrested and temporarily imprisoned. This state action was undeniably more intrusive and disproportionate, given the facts, than the advice proffered by McLane, which led to Brooks' petition for the temporary protection order. Thus, Manzano's reliance on Ripson is misplaced.
 
 
 27
 Manzano also contends that the investigative techniques employed by Wilkins and McLane violated many of the procedures set out by the SDDSS and the Pennington County Sheriff's Department and that their failure to follow proper investigative procedure constituted reckless indifference and resulted in the deprivation of his constitutionally protected liberty interest in familial integrity. Manzano argues that Wilkins improperly interviewed Brooks first before interviewing Abigail, failed to let Abigail tell her story in her own words, interviewed the child while Brooks was in the house, and neglected to interview him or his older daughter. With regard to McLane, he argues that she improperly interviewed the child while in uniform. More generally, Manzano argues that SDDSS employees Wilkins, Fleming, and Walsh, along with McLane, acted in an objectively unreasonable manner in that they ignored exculpatory evidence, sought to interfere with his relationship with his daughter by writing to the state court to advise against Manzano's unsupervised visitation with Abigail, and attempted to have civil and criminal proceedings brought against him by the state.
 
 
 28
 Myers sheds considerable light on the present case. In Myers, minor children and their guardians brought a Sec. 1983 action against various state and county prosecutors, therapists, and law enforcement officers for the techniques they used to investigate suspected sexual abuse by parents. As a result of the investigation, some children were physically separated from parents who were never charged with sexual abuse. A number of detectives were accused of engaging in improper interrogation when questioning the children in order to elicit fabricated allegations of sexual abuse. Like the present case, there was evidence in Myers that "some children who were questioned ... consistently denied having been abused and then later made accusations." Id. at 1459. In reaching the conclusion that qualified immunity was appropriate, we stated that
 
 
 29
 while the record contain[ed] examples of investigative mistakes and flawed interrogation, ... an imperfect investigation without more does not deprive the investigators of qualified immunity. Immunity is forfeited for the questioning function upon at least a preliminary showing that the interrogation so exceeded clearly established legal norms for this function that reasonable persons in the detectives' position would have known their conduct was illegal.
 
 
 30
 Id. at 1460. We further concluded that the interviewing conduct occurred in a "grey area of investigative procedure as to which there were, and probably still are, less than clearly established legal norms." Id. at 1461. Manzano has cited no authority which would indicate that the area has been clarified by subsequent legal precedent.
 
 
 31
 Although the record reveals an investigation which appears far from textbook perfect, the record of the investigation pursued by the SDDSS and the Sheriff's Department does not demonstrate conduct so outrageous that it offends the substantive component of the Due Process Clause. See Watterson, 987 F.2d at 8 (holding mere lack of due care in a child abuse investigation did not constitute a deprivation of due process). We note, for instance, that the state court in the May 1992 custody hearing found that "[t]he interviewers from the Department of Social Services and the Sheriff's Office were persistent in trying to get information from this three-year-old child, but were gentle and patient with her and spoke with her in quiet tones and tried to keep her on focus." Joint Appendix at 169. Further, the state court found that "[t]hese persons were competent interviewers" who "facilitated" fact-finding. Id. With regard to the other potential judicial proceedings, the Abuse and Neglect Petition was filed by the State's Attorney Miller only after his own interview with Abigail. As for the warrant request made by McLane, the record reveals only a memorandum from McLane to a deputy state's attorney. There was no further action on any possible criminal charges, and in fact, a warrant was never obtained. While Wilkins and McLane did not perfectly comply with established procedures,[4] Manzano has not come forward with evidence sufficient to create a genuine issue of material fact as to any official action which, if proven, would establish a constitutional violation of the right to familial integrity. Accordingly, we hold that the district court erred in failing to grant appellants' motions for summary judgment.
 
 III.
 
 32
 For the reasons discussed above, the judgment of the district court is reversed.
 
 
 
 [1]
 Masters of Social Work
 
 
 [2]
 We recognize that the Supreme Court's decision in Siegert v. Gilley, 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) (Siegert ), has caused considerable disagreement among the circuits with regard to the proper analytical framework for qualified immunity questions. See, e.g., DiMeglio v. Haines, 45 F.3d 790, 795-97 (4th Cir.1995); Acierno v. Cloutier, 40 F.3d 597, 606 n. 7 (3d Cir.1994) (banc). However, our court has consistently interpreted Siegert to mean that we must first address the question whether the plaintiff has asserted the violation of a constitutional right, and then consider whether the right was clearly established at the time of the alleged violation. See, e.g., Boyd v. Knox, 47 F.3d 966, 968 (8th Cir.1995); Munz v. Michael, 28 F.3d 795, 799 (8th Cir.1994); Cross v. City of Des Moines, 965 F.2d 629, 631-32 (8th Cir.1992)
 
 
 [3]
 Manzano also argues that Wilkins unreasonably "substantiated" child abuse on October 1, 1991, after the second interview with Abigail. Both parties use the term "substantiation" throughout their briefs, but neither provides a textbook, treatise, or expert definition of this word, which is presumably a term of art in the field of social work. Both parties do, however, provide completely different definitions of the term. Manzano claims that "[s]ubstantiation of sexual abuse by the social worker is the functional equivalent of an affidavit submitted in support of an arrest warrant." Brief of Appellee at 34. For this meaning, Manzano cites a case which does not even use the term. See Snell v. Tunnell, 920 F.2d 673, 690 (10th Cir.1990), cert. denied, 499 U.S. 976, 111 S.Ct. 1622, 113 L.Ed.2d 719 (1991). The SDDSS defendants claim that in South Dakota, "the effect of 'substantiation' is nothing more than an administrative determination that additional investigation is warranted." Reply Brief of SDDSS Appellants at 6. Without some sort of official or generally accepted meaning, the term can have no legal consequence here
 
 
 [4]
 Our holding should in no way be interpreted as approval of the conduct of McLane and Wilkins. While we recognize that "[s]ocial workers face extreme difficulties in trying simultaneously to help preserve families and to serve the child's best interests," Martinez v. Mafchir, 35 F.3d 1486, 1490 (10th Cir.1994), we note, nevertheless, that this complexity does not excuse the failure to follow established procedures. Even in the emotionally charged climate of child custody disputes involving allegations of sexual abuse, law enforcement and social services personnel must always strive to maintain their professional objectivity